[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 192 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 193 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 195 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 196 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 197 
It is not possible, in this case, to go much beyond a brief statement of our conclusions. To discuss all the questions raised by the numerous appeals, through their voluminous and complicated details, would prolong an opinion beyond what is either necessary or profitable.
We have reached the conclusion that the appellant, Rucker, should be allowed to prove in full all of the $810,000 of bonds, which he holds as a pledge, to secure the debt due him from the railroad company of $81,000 and interest, and which he can produce for that purpose; and is entitled to share in the distribution upon that basis to the extent of such indebtedness. It is not intended to deny, or question the rule that whether a director of a corporation is to be called a trustee or not, in a strict sense, there can be no doubt that his character is fiduciary, being intrusted by others with powers which are to be exercised for the common and general interests of the corporation, and not for his own private interests, and that he falls, therefore, within the doctrine by which equity requires that confidence shall not be abused by the party in whom it is reposed, and which it enforces by imposing a disability, either partial or complete, upon the party intrusted to deal, on his own behalf, in respect to any matter involving such confidence. *Page 199 
(Hoyle v. Plattsburgh Montreal R.R. Co., 54 N.Y. 328;Gardner v. Ogden, 22 id. 327; Twin Lick Oil Co. v.Marbury, 1 Otto, 587; Smith v. Lansing, 22 N.Y. 531;Aberdeen Railway Co. v. Blaikie Bros., 1 Macq. 461, per Lord CRANWORTH.) Nor is it at all questioned that, in such cases, the right of the beneficiary or those claiming through him to avoidance does not depend upon the question whether the trustee in fact has acted fraudulently, or in good faith and honestly, but is founded upon the known weakness of human nature, and the peril of permitting any sort of collision between the personal interests of the individual and his duties as trustee, in his fiduciary character. (Davoue v. Fanning, 2 Johns. Ch. 260.) But the rule was adopted to secure justice, not to work injustice; to prevent a wrong, not to substitute one wrong for another; and hence have arisen limitations upon its operation, calculated to guard it against evil results as inequitable as those it was designed to prevent. Thus, the beneficiary may avoid the act of the trustee, but cannot do so without restoring what it has received. (York Co. v. McKenzie, 8 B. Par. Cas. 42.) To cling to the fruits of the trustee's dealing while seeking to avoid his act; to take the benefit of his loan, and yet avoid and reverse its security, would be grossly inequitable and unjust. It would turn a rule designed as a protection, into a weapon of offense and injustice. And where the trustee's act consists, not in possessing himself of the property of the beneficiary as owner, but in taking collateral security for a debt honestly due him, or a liability justly incurred, the rule can have no application, since the payment of the debt or the discharge of the liability is an essential prerequisite of the avoidance. And this is true whether the pledge be taken for a present or precedent debt. In either case the equity to be regarded equally exists. It is upon this ground that the case of Smith v.Lansing (22 N.Y. 520) stands. The collateral taken there was after the creation of the liability, and we held the transaction valid. The ground of the decision was distinctly stated to be that the association had received the direct benefit of the several amounts of money *Page 200 
to secure which the bonds were given, and the creditors had indirectly received the benefits of the same by the consequent increase of the assets; and that, upon the application of the beneficiary or its receiver, the trustee should be permitted to set up any equities which existed, entitling him to retain the property, either absolutely or as security for the moneys advanced or liabilities incurred. Since, therefore, in the case of a pledge delivered as security for a just and honest debt, the principal may always redeem upon payment, and the rule of equity is in no respect different, we do not see that it has any application, or can in any respect modify the legal relation of the parties.
The pledge of Rucker and its validity is, however, attacked from another and a different direction. It is argued that the right to make the mortgage under which the bonds were issued is given by the statute (Laws of 1850, chap. 140, § 28, subd. 10), and is limited to an authority, "from time to time, to borrow such sums of money as may be necessary for completing and finishing, or operating their railroad, and to issue and dispose of their bonds for any amount so borrowed, and to mortgage their corporate property and franchises to secure the payment of any debt contracted by the company for the purposes aforesaid." It is then argued that the railroad corporation had no right to pledge its bonds as security for a precedent debt, as was done in the present case. But if the precedent debt was contracted in the process of borrowing money for the construction or operation of the railroad, we do not see that the purpose of the statute is at all violated or avoided. Its terms do not require that the borrowing and the issuing of the bonds should be simultaneous acts. The former may naturally and properly precede the latter. In the present case there is neither proof nor intimation that the loan of Rucker was for a purpose outside of the statute, but on the contrary all the facts indicate that the money he advanced went actually into the construction of the road.
We conclude, therefore, that he is entitled to prove so many of the $810,000 of bonds as he holds, and can produce as *Page 201 
pledgee, and share in the distribution accordingly up to the amount of his debt.
It was error to reject the bonds held by Rucker as the assignee of the Loan and Indemnity Company, and those which he received as a pledge from the Bessemer Company. The transactions relating to these bonds occurred after he had ceased to be an officer of the railroad company, and when he occupied toward it no relation of trust or confidence which could, on any theory, expose his action to scrutiny or criticism.
He dealt, therefore, like any other stranger, and is entitled to prove such of these bonds as he holds as pledgee and can produce for that purpose, and receive the dividends thereon to the amount of the debts respectively which the bonds were pledged to secure. The objection made to the title of the Loan and Indemnity Company that it violated the law in discounting the note of $25,000, and so the pledge falls with it (R.S. part 1, tit. 20, chap. 20, §§ 1 and 5), is answered by a reference to the charter of the company (Laws of 1870, p. 1803), which authorized it to "advance moneys, securities and credit upon any property, real or personal," and by our recent decisions, that, even if the note discounted was void, the loan and its security were valid, and capable of being enforced. (Pratt v. Short, 79 N.Y. 437;Pratt v. Eaton, id. 449.)
We see no reason to disturb the conclusion arrived at by the referee and affirmed by the General Term as to the bonds of Henry W. Johnson, amounting to $40,500. His ownership is assailed by Rucker, who claims that he lacks forty-two bonds of those originally pledged to him, and that they now appear in Johnson's possession. The latter received them from one Ball, who was a contractor, and who got them from the railroad company in settlement of his account. As Rucker, at one time, surrendered his pledged bonds, and devoted them to the construction of the road, so that it was possible for Ball to receive them rightfully, we do not see that the title of Johnson is imperfect, or that Rucker has established any paramount claim. *Page 202 
Artemas S. Cady was found by the referee to be the owner of $31,000 of the bonds, and the pledgee of $34,000 more, which last were held as collateral to a loan of $5,000 and interest. The loan was through the Bessemer Company, to whom the bonds had been promised upon their contract for construction. The referee allowed the bonds owned to be proved in full, and those held in pledge also in full, but limiting the dividend thereon to the amount of the loan and interest.
Inadequacy of consideration, and an alleged inability of a railroad corporation to apply its bonds by way of pledge, at least as security for a precedent debt, were the only grounds of objection urged. We do not think they are sound. Since Cady was neither officer nor director, and owed no duty by virtue of such relation to either the Bessemer Company or the railroad, he had unquestionably the right to take as large a "margin" for his loan as the borrower was willing to grant. Nor can we discern any valid reason why a railroad corporation may not dispose of its bonds by way of pledge as well as of sale, and in the absence of proof that the proceeds of the loan were, with the knowledge of both parties, to be applied to some purpose not authorized by the statute permitting their issue, we can see no reason, as has already been said, why they might not be used as a pledge to secure an indebtedness already existing. We agree, therefore, as to these bonds with the conclusion of the referee.
Charles D. Bailey bought $10,000 of the bonds of the old company from E.F. Mead, who was, at the time, one of its directors. After the consolidation Bailey was allowed, upon the surrender of his old bonds, to receive an equivalent amount of the new ones. It is objected that Mead bought these bonds of his company at fifty-one cents on the dollar, which is probably true; that being a director he could not thus buy below par except at the peril of avoidance by the courts upon the application of the corporation, which must be conceded (Cumberland Coal Co. v.Sherman, 30 Barb. 565; Butts v. Wood, 37 N.Y. 317;Coleman v. Second Ave. R.R., 38 id. 201); that his title was, therefore, *Page 203 
defective, which, as between himself and the company, may be granted; and that Bailey, being also a director, was not protected in his purchase. The difficulty is an utter absence of proof as to the last material fact. We do not know the date of Bailey's purchase. It may have been before he was elected director. If so, there was nothing to affect his position as a purchaser for value and in good faith, unless the fact that he knew Mead to be a director was enough to put him on inquiry and charge him with constructive notice of the defect in the title. We cannot so decide. A director may be the lawful and honest holder of the bonds of his company. There is no presumption to the contrary. The fact is not even just ground of suspicion. The referee, therefore, properly allowed the $10,000 of bonds to be proved in full. As to the remaining $1,500, our conclusion is different. They were plainly a bonus, taken by Bailey, while a director, on his stock subscription, and for which he paid nothing. His attempted reversal of the process is wholly ineffectual in the face of the proved action of the company authorizing the bonds to be given as a bonus, instead of the stock. We cannot sustain this transaction. Very likely the stock was worthless, but that does not palliate or excuse the proceeding. It is true the bonds were exchanged for those of the new company, and that fact is relied upon to make him a holder for value, and as a ratification by the company. But either view is answered by the fact that he was a director when the exchange was authorized and when it was made. He had the power and the opportunity to aid in an effort to ratify his previous wrong, while his obvious duty as an official was exactly the reverse. He had full knowledge of all the facts and did not act in good faith. The $1,500 of bonds, therefore, cannot be proved.
These views involve in the same fate the bonds of both Hall and Benedict. They each received their bonds as a bonus while they were directors of the company, and remained such when the new bonds were made and authorized to be exchanged. It is said in the opinion of the General Term that the bonds of Hall were not disputed. That is a mistake. *Page 204 
Their allowance by the referee was expressly excepted to on behalf of Rucker.
The bonds of Austin Stevens were properly allowed to be proved. He bought them of Duncomb who was a director, and whom he knew to be such, but did not know how Duncomb obtained them, or of any defect in his title.
Those of Daniel H. Temple for $5,000 were allowed by the referee, but rejected by the General Term. They were taken by him of Duncomb in pledge for a precedent debt. As a consequence he cannot be deemed a holder for value, and must be held to have taken no better title than that of his pledgor. (Taft v.Chapman, 50 N.Y. 445; Coddington v. Bay, 20 Johns. 645;Stalker v. McDonald, 6 Hill, 93; Weaver v. Barden,49 N.Y. 286.) The title of Duncomb was vulnerable. He got his original bonds from the company, partly for alleged salary, partly at fifty-one cents on the dollar, and partly as a bonus for stock subscription. He was a director in the old company while thus obtaining the bonds and a director in the new company when the exchange of securities was made. His title, therefore, was bad and that of his pledgee must fall with it.
As to the bonds of Joshua C. Saunders, there appears to be no doubt that he was the actual owner and holder of $6,000 of them. The referee so finds, and the evidence warrants his conclusion. The balance of $21,000 were held by him as collateral to a note of $1,000. Pending the inquiry before the referee the pledge was foreclosed by a sale at auction, and Saunders testifies that through such sale he became the owner. His testimony is, "these bonds I now own by sale under the power given in the note under which they were hypothecated." That is all we know about it. What the terms of the note were; whether before sale there was a demand of payment and opportunity to redeem (Milliken v.Dehon, 27 N.Y. 364; Lawrence v. Maxwell, 53 id. 19); whether the sale was on notice or not, and who became the purchaser, we are left to imagine. We are, perhaps, bound to assume from what is shown that he bought them in at the sale. He does not *Page 205 
assert any other or different title. If so, he must still be treated as pledgee since he had no right to buy. (Bryan v.Baldwin, 52 N.Y. 232.) The referee correctly decided that these bonds held as collateral could be proved in full, but the dividend payable upon them should be limited to the amount of the debt. The pledge appears to have been for present advances, so that Saunders was a holder for value. (Durbrow v. McDonald, 5 Bosw. 130; Winne v. McDonald, 39 N.Y. 233; McNeil v. TenthNational Bank, 46 id. 325.) The modification by the General Term which tended to destroy his margin was erroneous.
In the case of the National City Bank we think the referee was wrong, and the modification made by the General Term was also erroneous. The bank loaned $35,000 to George W. Mead, who at the time was a director in the railroad corporation, and known to be such, taking $70,000 of the bonds as collateral. There is no proof that the bank or any of its officers had any knowledge of a defect in his title. That they knew him to be a director was not enough, as we have already said, to put them on inquiry. It is further claimed, however, that the bank, having a capital of $300,000, violated the law in making this loan to Mead of $35,000. (National Banking Act, §§ 5200, 5239, U.S. Stats.) The penalty of such violation is fixed by the act itself, and consists in proceedings against the franchise of the bank, and a liability for damages of the offending officers. As to this question, which arises under the Federal law, and respects corporations created by its authority, we must follow the rulings of the Federal courts, and those determine very clearly that the contract of loan was not invalid but may be enforced. (Gold-Mining Co. v. National Bank, 96 U.S. 640.)
As to the claim of John J. Studwell for $70,000 of bonds, we must be guided by the findings of the referee, that Studwell, by assignment from Cornell, the Park Bank and The National Citizens' Bank, acquired their rights to the debts held by them respectively, and the bonds pledged as collateral. His title as pledgee, derived from these sources, has not been *Page 206 
successfully attacked; and the referee, instead of limiting him to the proof of bonds equal to the debts secured, should have allowed him to prove all the bonds and receive a dividend thereon to an amount not exceeding the amount of the debts for which they were held as collateral.
The claim of the East River National Bank should be corrected in the same way. It should be allowed to prove all its bonds and share in the distribution to the amount of the debt for which it holds them as security.
The bonds of Eliza Hatfield, held by her to the amount of $20,000, were allowed by the referee to the extent of $2,137, and no more. This was the amount found due upon the debt for which the bonds were held as collateral. The referee's finding was corrected at Special Term, in accordance with the exception filed on the claimant's behalf, and it was determined that she held $13,000 of the bonds as collateral, and should be entitled to receive their proper dividend up to the sum of $2,352.65, and owned $8,000 of said bonds absolutely. There is evidently still an error, for the two sums make $21,000 of bonds instead of $20,000, which was the whole amount. On examining the exception, which was allowed by the Special Term, it is evident that the collateral bonds were 1,087 to 1,098, both inclusive, or $12,000 instead of $13,000. On this claim, therefore, the $8,000 of bonds should be proved in full, and also the remaining $12,000; but on these last no dividend should be paid beyond the sum of $2,352.65.
The bonds of George W. Mead, to the amount of $19,500, were disallowed by the referee, but allowed by the General Term, at the amounts said to have been actually paid by him. The evidence leads us to prefer the conclusion of the referee. It is extremely doubtful whether Mead paid any thing what ever for the bonds. His position as director, and the manner in which he sought to use it for his own benefit, make it very clearly our duty to avoid the whole transaction and affirm the conclusion of the referee.
As to the Grocers' Bank, it is conceded by the counsel for *Page 207 
the receiver that we can do no more than affirm the conclusion of the General Term.
The claim of William R. Kirkland was rejected both by the referee and the General Term. He was elected president of the railroad company in 1873 and his salary fixed by a resolution of the board of directors at $5,000 per annum. The company failed to pay and gave him its notes for $3,500 and $7,000 of the mortgage bonds as collateral. The salary was honestly due. It was a just debt against the company. The latter has no possible ground of defense against it. Why might not such a debt, fairly and honestly incurred, in the absence of means of payment, be secured by the pledge of the bonds? Grant that the creditor's official position should awake scrutiny and sharpen criticism. Yet the right of the officer to fair compensation which has been honestly earned is as clear as that of a stranger. His services were as necessary to the construction of the road as those of the laborer who laid the rails. The president took the bonds merely in pledge. The right of redemption remained. The company could at any time have repossessed its bonds upon the condition, surely equitable, of paying the debt it owed. No undue or improper advantage was obtained. We are of opinion, therefore, that Kirkland is entitled to prove his bonds, and share in the distribution on that basis.
The Seaman's Bank for Savings also appeals from the order which excludes it from the benefit of $2,000 of bonds held as collateral. It appears that the company was indebted to the bank for rent, and these bonds were turned out as security. The bank had the right to demand and receive them. No possible ground of objection occurs to us except an assertion that such use of the bonds was not justified by the lawful purposes of their issue, and the perversion was of course known to the pledgee. But such a construction would be altogether too rigid and narrow. A business office was essential and necessary and fairly embraced within the authority to issue bonds for the purpose of building, operating and maintaining a railroad. It was a necessary and indispensable aid to the end sought to be accomplished. *Page 208 
As the bank was merely a creditor, it had the right to insist upon security for its rent, and having received a pledge of the bonds to hold them, and prove them to their full amount, and receive a dividend thereon, not exceeding the amount of their debt.
We are satisfied with the conclusion reached as to the bonds of Mordecai M. Smith. As to $9,000 of them he was found to be purchaser and owner and permitted to prove them as such. As to the larger amount, all parties seem to concur in treating the alleged title of Wiley, obtained upon a sale of the collateral at auction, as not affecting results. To give it effective force in the absence of definite proof as to its regularity and propriety, and under the circumstances of suspicion which surround it, would hardly be justifiable; and since all his rights were assigned to the parties for whom he evidently acted, it is proper to dismiss it from consideration, and treat the case as if he had not intervened. The firm of Mead Clark made certain advances to the railroad company upon the faith of these bonds pledged with them as collateral security. Since both were directors the transaction, even if open to criticism, and liable to avoidance, was modified by the further fact that the bonds were pledged for actual advances, and therefore the avoidance could only be made upon condition of the repayment of the advances. Mead Clark could assign to Smith their debt due from the company and the collateral with it, though not as their own property or in derogation of the rights of the original pledgor. (Nash v.Mosher, 19 Wend 431; White v. Platt, 5 Den. 269; Hays v.Riddle, 1 Sandf. 248; Lewis v. Mott, 36 N.Y. 395.) By the assignment to Smith he acquired the rights of Mead Clark to the extent of their advances, and was properly allowed to prove his bonds as security for that amount.
We should modify the orders of the Special and General Terms to correspond with these views if the facts before us would admit of so doing with absolute accuracy; but as we cannot say what bonds may or may not be produced and proved under our rulings we reverse the orders of the Special and General *Page 209 
Terms and remand the case to the Special Term for a further hearing, costs to be adjusted below.
All concur.
Ordered accordingly.