28    79
27ap153

# THE MARIETTA AND CINCINNATI RAILROAD COMPANY (AS REORGANIZED), APPELLANT, *v.* ALBERT L. MOWRY AND GEORGE H. BEND, RESPONDENTS, IMPLEADED, ETC.

*Notice — all the members of a firm are charged with notice of facts known to one partner — when they are chargeable with such notice after the dissolution of the firm.*

In the year 1866, one Samuel B. Keys was a member of the firm of Keys & Brother, of Cincinnati, and also of the firm of Mowry, Keys & Bend, of the city of New York. In the course of that year Keys purchased in behalf of his firm bonds issued by the plaintiff, which were void in his hands and in the hands of his firm, because he being a director of the company had purchased them for less than their par value, in violation of a statute of the State of Ohio, and because nothing was in fact ever paid to the company for them. Subsequently the firm of Keys & Brother, being indebted to the firm of Mowry, Keys & Bend on account of stock purchased and advances made by the latter firm, sent to it the said bonds to be held as collateral security for the payment of such debt. In March, 1867, both of the firms being then dissolved and in process of liquidation, an agreement was executed by the

two firms, and by each of the members thereof, whereby the late firm of Keys & Brother transferred to the late firm of Mowry, Keys & Bend certain stocks and securities, including the said bonds, in satisfaction of a large indebtedness due to the New York firm. On the same day three of the members of the late firm of Mowry, Keys & Bend transferred to the fourth member, the defendant Mowry, all their right and title to the said securities, he assuming the liabilities of the said firm and indemnifying his partners individually against them.

In this action, brought by the company against the members of the New York firm to recover damages for a wrongful conversion of the bonds:

*Held,* that as Samuel B. Keys had actual knowledge of the defective title of the firm of Keys & Brother to the bonds, his partners in the New York firm were chargeable with constructive knowledge thereof and acquired no better title to the bonds than their pledgor had.

That the partners of the said Samuel B. Keys were affected by and chargeable with such constructive knowledge after the dissolution of the firm, and while negotiating for the settlement of the affairs of the two firms and the transfer of the securities of the New York firm to Mowry.

That the defendants Mowry and Bend, by reason of such constructive knowledge, were liable to the plaintiff for the conversion of the bonds.

APPEAL from a judgment, entered on the report of a referee dismissing the complaint on the merits as against the defendants Mowry and Bend.

*A. J. Vanderpoel,* for the appellant.

*Wm. Allen Butler,* for the respondents.

BRADY, P. J.:

The following are the findings of fact by the referee:

The plaintiffs, at the time of the transactions hereinafter mentioned and of the commencement of this action, were a railroad corporation under the laws of the State of Ohio.

In January, 1866, they executed 2,500 bonds of $1,000 each, secured by second mortgage upon their line of railroad, said bonds being payable to bearer and numbered consecutively.

On the 10th of March, 1866, sixty of said bonds numbered eighty to 140 inclusive, were sent from the office of said company at Chillicothe, Ohio, by an officer thereof, to the defendant Samuel B. Keys, at Cincinnati, Ohio. On the 24th day of July, 1866, 140 of said bonds, numbered 638 to 777, were in like manner sent to said Keys.

These bonds had not yet been issued for value, and no money was paid by said Keys for them when they were so sent to him.

On or about the 28th of June, 1866, Samuel B. Keys, on behalf of his firm of Keys & Brother, of Cincinnati, made an arrangement for the purchase of 200 of said 2,500 bonds at fifty-five cents on the dollar, payable in one year; said arrangement was made in the city of New York, between said Keys and Noah L. Wilson, Blakely Wilson, Le Grand Lockwood, William Hoag and S. W. Hazeltine, all said persons being directors of said company, and assembled together at the time the bargain was concluded. The 200 bonds so arranged for were delivered to said Keys by his taking into account the sixty bonds sent him on the 10th of March, 1866, which had not then been used by him, and by sending to him the 140 bonds above mentioned as sent on the 24th of July, 1866.

At this time said Samuel B. Keys was a director of the plaintiffs' company, and had been since 1861, and he continued to be a director until 1869; he was also a member of the firm of Keys & Brother, of Cincinnati, which was composed of himself, Richard W. Keys and Edward S. Lea.

From the 1st of April, 1866, said Samuel B. Keys and Richard W. Keys were also members of the firm of Mowry, Keys & Bend, in the city of New York, composed of the defendants herein. This firm was dissolved about the 23d day of February, 1867.

The business of said firms of Keys & Brother, and of Mowry, Keys & Bend, was that of dealers in gold, stocks, bonds and other securities.

During 1866 the firm of Keys & Brother, of Cincinnati, transacted business with the firm of Mowry, Keys & Bend, in New York, the business consisting in the latter firm of buying and selling gold, stocks, bonds and other securities for the firm of Keys & Brother; the account was an active one; the firm of Keys & Brother was constantly debtor to the firm of Mowry, Keys & Bend, and from time to time sent to said firm bonds, stocks and other securities on pledge or as collateral security for the account.

On the 25th of July, 1876, Keys & Brother, so sent to Mowry, Keys & Bend, 140 second mortgage bonds of the plaintiffs; on the 19th of September, 1866, ten other of said bonds, and in January, 1867, sixty other of said bonds; of said 210 bonds the firm of

Mowry, Keys & Bend sold for account of Keyes & Brother fifty-five, leaving on hand at the time of the dissolution of Mowry, Keys & Bend, and in their possession as pledgees, and by way of security as aforesaid, 155 of said bonds, being those described in the complaint.

The plaintiffs never received from Samuel B. Keys, nor from his firm of Keys & Brother, nor from the defendants' firm, any money on account of said bonds.

The following statute of the State of Ohio was in force during the years 1866, 1867:

SECTION 1. Be it enacted, etc., that the directors of any railroad company, authorized to borrow money and to execute bonds or promissory notes therefor, shall be, and they are hereby authorized to sell, negotiate, mortgage or pledge such bonds or notes, as well as any notes, bonds, scrip or certificates for the payment of money or property which such company may have heretofore received, or shall hereafter receive, as donations or in payment of subscriptions to the capital stock, or for other dues of such company, at such times and in such places either within or without the State, and at such rates and for such prices as in the opinion of said directors will best advance the interests of such company; and if such notes or bonds are thus sold at a discount, such sale shall be as valid in every respect, and such securities as binding for the respective amounts thereof, as if they were sold at their par value.

SECTION 2. No director of any railroad company shall, either directly or indirectly, purchase any shares of the capital stock or any of the bonds, notes or other securities of any railroad company of which he may be a director for less than the par value thereof; and all such stocks, bonds or notes or other securities that may be purchased by any such director for less than the par value thereof shall be null and void.

On or about the 11th of March, 1867, agreements in writing were executed between the firm of Keys & Brother, in liquidation, and each member thereof, and the firm of Mowry, Keys & Bend, in liquidation, and each member thereof, both of said firms being then dissolved, by which agreements the said late firm of Keys & Brother transferred to the said late firm of Mowry, Keys & Bend certain stocks and securities which said Mowry, Keys & Bend then held as

security, including, specifically, the said 155 bonds, in satisfaction of a large indebtedness from said late firm of Keys & Brother to Mowry, Keys & Bend, and Samuel B. Keys, Richard W. Keys and George H. Bend, as members of said late firm of Mowry, Keys & Bend, transferred to the defendant Albert L. Mowry all their right and title to said securities, he assuming the liabilities of said Mowry, Keys & Bend and indemnifying them individually against the same.

During the year 1867 said Mowry from time to time sold and disposed of the said 155 bonds to purchasers in New York and Baltimore.

Neither the said Mowry nor the said Bend ever had any knowledge of the manner in which Samuel B. Keys had come in possession of said bonds, nor of any claim of the plaintiff in respect to the same against him, until after the execution of the said agreements, and after the sale by defendant Mowry of the said bonds, nor until about the time of the commencement of this action.

"I find as matters of law that Samuel B. Keys and the firm of Keys & Brother never acquired any title to the said bonds as against the plaintiffs.

That the firm of Mowry, Keys & Bend did not acquire any title to said bonds by virtue of the delivery of them to said firm as security for the dealings with said firm of the firm of Keys & Brother, being at the time of such delivery chargeable with constructive notice of the want of title of said Keys & Brother.

That, by the settlement of March, 1867, the defendants Albert L. Mowry and George H. Bend became *bona fide* purchasers for value of said bonds, and, as between them, the said Mowry became a *bona fide* purchaser for value of the bonds, and was such when he subsequently sold and disposed of the same.

That the defendants Albert L. Mowry and George H. Bend are entitled to judgment that the complaint be dismissed, with costs.

The appellants took ample exceptions to the findings of the referee, and to his failure and refusal to find certain propositions of fact and law ; and the appeal, therefore, is presented in proper form to require the consideration of the point involved. It will be perceived, from the findings of law of the referee, that he regards the settlement of March, 1867, as an incident by which the

defendants Mowry and Bend became *bona fide* purchasers for value, of the bonds, and that Mowry, as between them, became the *bona fide* purchaser for value, of these bonds, and was such when he subsequently sold and disposed of them. This presents the point in the case, because it is declared substantially by the referee that but for this settlement the plaintiffs would be entitled to recover."

The learned referee has delivered an opinion, which is as follows:

" As between Samuel B. Keys and the plaintiffs it seems quite clear that he never derived any title to the bonds in question.

His position as a director of the company forbade him to take the bonds in the manner disclosed by his own testimony, whether the transaction be judged by general law or by the statute of Ohio.

The firm of Keys & Brother stood in no better position than Samuel B. Keys at the time the bonds were sent to New York. There is no evidence that that firm paid anything to Samuel B. Keys for the bonds, nor that they did not get them through him in the course of partnership dealings. In fact, the transaction, as entered upon the books of the company, is a charge directly against Keys & Brothers and not against Samuel B. Keys, though he negotiated the purchase.

Coming then to the dealings between the Cincinnati and New York firms, I think they were of such a character as made the latter firm holders for value, but they must, I think, be considered as chargeable with constructive notice, by reason of the membership of Samuel B. Keys in both firms, of the defect in his title.

This point is not free from difficulty. The rule on the subject is thus stated in Lindley:

" Notice to a principal is notice to all his agents and notice to an agent of matters connected with his agency is notice to his principal. Consequently, as a general rule, notice to one partner of any matter relating to the business of the firm is notice to all the other members, and if two firms have a common partner, notice which is imputable to one of the firms, is imputable to the other also, if it relates to the business of that other. .

" In conformity with these principles, if a firm claim the benefit of a transaction entered into by one of its members, it cannot effectually set up its own ignorance of what that member knew, so as to be in a better position than he himself would have been in,

had he been dealing on his own account as principal." (Lind. on Part., 304, Eng. ed. of 1873.)

From my examination of the cases, I think this an accurate state ment of the general doctrine. The difficulty, however, lies in determining when the matter, in respect to which the knowledge of one partner is sought to be imputed as notice to all the others, in fact relates to the business of the firm, or when the knowledge of the one firm sought to be imputed to the other in fact relates to the business of that other.

In the present case, the transactions of the New York firm in making advances to the Cincinnati firm were in the line of business of both firms, and if S. B. Keys, individually or through his Cin- cinnati firm, sent to the New York firm, as collateral, stocks or bonds as to which he knew the Cincinnati firm had no title, that knowledge must, it seems to me, be imputed to the New York firm. Suppose he had not been a member of the Cincinnati firm, that there was no common partner in the two firms, and that, in that position of things, the Cincinnati firm had applied to Mowry, Keys & Bend for an advance on government bonds which S. B. Keys knew were stolen property. Being a member of the firm making the advance, his knowledge would necessarily be imputed to his firm, and the true owner of the bonds could reclaim them, no matter how ignorant the other members were of the facts which vitiated their title. I cannot see that S. B. Keys, being also a member of the firm transmitting the bonds, would strengthen the position of the firm receiving them. The case of *Steele* v. *Stuart* (L. R., 2 Eq., 84), is an authority very decidedly in point and sup- ports the views I have stated.

I conclude, accordingly, that plaintiffs would have been entitled to recover had they reclaimed the bonds at any time before the settlements of March, 1867.

At this time, however, the relations between the two firms were dissolved. The bonds, as between Keys & Brother and Mowry, Keys & Bend, were the property of Keys & Brother, and not of Mowry, Keys & Bend, who were simply pledgees of them. Then Keys & Brother transferred them to Mowry & Bend in satisfaction of their indebtedness, and Mowry & Bend released Keys & Brother and every member of that firm.

This made Mowry & Bend holders for value. The rule seems now to be settled that when one acquires property in good faith from a person having the apparent ownership, but no actual right, a payment of cash at the time is not necessary in order to protect the right of the transferee as against the true owner. It is enough that his position was substantially altered by relying on the apparent title. (*Voorhis* v. *Olmstead*, 66 N. Y., 113; *Cont. Nat. Bank* v. *Nat. Bank of Commonwealth*, 50 id., 575.)

The only question then is, did this settlement make them holders for value, without notice?

It is to be considered that Mowry & Bend never had actual notice. The only notice with which they were ever chargeable is constructive or imputed notice. I think they ceased to be chargeable with such notice when the relations between the two firms ceased, and the qualified title ceased to which this imputed notice attached. The parties were no longer partners, and neither could charge the other with new obligations by reason of their previous relations. Nor did the constructive notice with which Mowry & Bend were chargeable, during the existence of the partnership relations between the common members of the two firms, continue after the dissolution, for this would make constructive notice the same as actual notice.

The rule which charges a principal with his agent's knowledge is a rule of policy, not of evidence. It does not establish actual knowledge on the part of the principal. Actual notice would outlast a termination of the agency; but, in reference to imputed notice which is not actual, the rule is, that when the agent ceases to be agent, the principal is no longer chargeable with his knowledge, though, as to transactions had during the agency, knowledge is imputed to him.

Suppose that, during 1866, Samuel B. Keys had been Mr. Mowry's agent in Ohio for the purchase of railroad bonds.

If Mr. Keys had charged him in account with the bonds in question during the existence of such agency, Mr. Mowry would have been chargeable with knowledge of the defect in Keys' title. But if the agency were terminated, and afterwards Mr. Mowry bought the bonds from Keys, as a principal, for value and without notice, the fact that Keys had acquired the bonds wrongfully during the

time covered by the agency would not charge Mr. Mowry with notice. This seems to me clear from the reason of the rule. The principal is chargeable with the knowledge of the agent, "for the reason that the agent is substituted in his place and represents him in the particular transaction." (*Bank of U. S. v. Davis*, 2 Hill, 451, 463.)

This cannot be the case where there is no transaction between the principal and agent, or where the transaction, after the agency has ceased, is between the parties as principal and principal.

So, in applying the rule where there are partnership relations, if S. B. Keys had sold the bonds in question directly to Mr. Mowry, individually, at any time in 1866, it could hardly be claimed that the latter would be chargeable with Keys' knowledge of his own want of title, because they were partners in other transactions. So, when the partnerships were dissolved, if Keys & Brother had redeemed the bonds, paying their indebtedness to Mowry, Keys & Bend, it would hardly be claimed that a subsequent sale for value by Keys & Brother to Mr. Mowry would charge him with notice of the defect of title of Keyes & Brother by reason of the previous relations of the two firms.

Being satisfied that defendants Mowry & Bend are not liable to the plaintiffs for a conversion of the bonds in question, it is unnecessary that I should examine the point made; that if they are, they are only liable to nominal damages, because of the statute of Ohio, which makes bonds sold to a director void. The result of my consideration of the case is that the complaint must be dismissed.

It will be perceived that he discusses the question which he himself presents, namely: Did the settlement make the defendants holders for value without notice? He thinks it did because the relations existing between Keys and the others had ceased; and the qualified title had also ceased to which the notice by imputation attached. He thinks that being no longer partners neither could charge the other with new obligations by reason of their previous relations; and that the constructive notice with which Mowry, Keys & Bend were chargeable, because of the existence of the copartnership relations between the common members of the two firms, did not continue after the dissolution. For this, he says, would make constructive as well as actual notice. The opinion

shows reflection and research in reference to the question discussed; and while we concur with him in his views generally, and adopt them as a correct exposition of the law of this case, nevertheless it is thought that the legal effect given to the settlement between the parties founded on the instruments to which reference has been made is erroneous. · There can be no doubt, and the referee so declares, that the firm of Mowry, Keys & Bend received the bonds with notice of their wrongful taking by Keys & Brother, and they therefore took no better title than S. B. Keys or Keys & Brother; and this doctrine controls the ultimate result, inasmuch as Mowry cannot divest himself in reference to them of his copartnership relation on the facts of this case. This would seem to be well settled.

In *Jacaud* v. *French* (12 East, 317), Lord ELLENBOROUGH said: "It is impossible to sever the individuality of the person. * * * If A. & B., partners, receive money to apply to a particular purpose, A. & C. in another partnership, could never be permitted to contravene the receipt of it for that purpose and apply it to another." (See, also, the case of *Powles* v. *Page*, 3 C. B., 16, 30; E. C. L. R. [vol. 54], page 16.)

So in the case of *In re Worcester Corn Exchanje Company* (3 De G., M. & G., 180), in which the directors of the company exceeded their powers in borrowing money. Part of the money advanced had been lent by a bank, one of the partners in which was a shareholder in the company. *Held*, that as between the company and the bank the latter must be deemed to have had notice of the restricted liability of each shareholder, and therefore had no claim against the company for the advance.

Lord CRANWORTH said: "Here the bank must be held to have had clear notice of the stipulations of the deed, and of the limited liability of each shareholder, for one of the partners in the bank was a shareholder in the company."

The case of *Steele* v. *Stuart* (L. R., 2 Eq., 84) is one bearing on the question under consideration. In that case it appears that the plaintiff agreed to send bills to the firm of Staig & Stuart, at Kirkcaly, to secure their advances to him. They were to negotiate the bills and apply the surplus to a particular purpose. Subsequently, Staig & Stuart being in want of funds, directed the bills

to be remitted, not to themselves but to a firm of bankers, Stuart, Brothers (having a common partner with themselves), in London, as security for advances made to them by Stuart Brothers. Staig & Stuart became bankrupt, and a bill was filed against Stuart Brothers to compel them to account for these bills and apply the proceeds to the purpose for which they were originally given.

The question, as stated by the counsel in the case, was whether a firm consisting of A. & B., can retain moneys which have been appropriated to a particular purpose by a firm consisting of B. & C. ; and they contended that the contract between the plaintiff and Staig & Stuart being proved, the knowledge of Stuart Brothers followed from the fact of the common partners, and it was held that Stuart Brothers had notice of the arrangement between the plaintiff and Staig & Stuart, through the fact of a common partner, and that the bills in the hands of Stuart Brothers must be appropriated in equity accordingly.

Sir W. Page Wood, V. C., said in the course of his opinion : " It is proved that Stuart Brothers had notice, because one member of their firm and of the firm of Staig & Stuart is the same individual and the notice cannot be separated.".

There would seem to be no doubt in this case therefore, on these authorities, that by the existence of the common partner the respective firms are chargeable with notice of the want of title in Keys to the bonds in question, and this knowledge must, it would seem, also necessarily attach to each of these persons, in all its legal consequences, as to anything which formed a part of the assets of either of the firms as between the respective members ; and therefore if there was any vice in the title of anything held in the possession of the partners that was transferred either at the time of the dissolution or upon the settlement of the copartnership affairs, the transfer would carry with it such vice.

This rule is evolved from several adjudications in our own courts affecting the relation of copartners each to the other, and the continuance of that relation after the dissolution of the firm for purposes connected with the joint property. In the case of *Van Keuren* v. *Parmelee* (2 Comst., 523), the general powers of a partner after the dissolution of a firm were discussed by Bronson, J., who said, among other things : " Each partner, when acting within the

scope of the partnership, is deemed to be the authorized agent of all his fellows," and that "the authority is presumed from the nature and necessity of the case; for without it, third persons would not be safe in dealing with one of the associates, and the business of the partnership could not be carried on with success." It was said, it is true, that the agency continued no longer than the necessity for it existed, and for most purposes the necessity ceases with the termination of the partnership, but further, "when that is dissolved, there is no longer any ground for presuming an agency, except as to such things as are indispensable in winding up of the concerns of the company. If there be no agreement to the contrary, it may be presumed that each partner still has authority to dispose of the partnership property, to collect, adjust and pay debts, and give proper acquittances." In *Robbins* v. *Fuller* (24 N. Y., 570), DENIO, J., after stating the powers of the partners during the continuance of the partnership, said: "But the dissolution of the firm, though it annulled the powers of the respective partners for many purposes, and particularly as to the contracting of debts, and the creating of obligations against the copartnership, did not put an end to their authority to administer the assets in accordance with the rights and interests of the parties interested in them, and with the intention of the partnership enterprise. For this purpose the partnership is considered as continuing."

In *Murray* v. *Munford* (6 Cow., 441), the court said: "A dissolution of a partnership does not, I apprehend, *ipso facto*, destroy the joint tenancy of the partners in the partnership property and create a tenancy in common. They are still partners for the purpose of settling the partnership concerns, and until that is effected. For that purpose the partnership may be said still to continue with all the incidents belonging to that relation."

The same doctrine was substantially asserted in *Ex parte Hall* (17 Ves., 62).

In *Butchart* v. *Dresser* (4 De G., M. & G., 542), it was declared by TURNER, L. J., that the general law was clear that a partnership, although dissolved, continued for the purpose of winding up its affairs. He said: "Each partner has after, and notwithstanding the dissolution, full authority to receive and pay money on account of the partnership, and has the same authority to deal with the

property of the partnership for partnership purposes as he had during the continuance of the partnership." "This must," he said, "necessarily be so."

The instruments of March 11, 1867, grew out of the copartnership relations. One of them was a release by Keys & Brother, as a copartnership, to Mowry, Keys & Bend, as a firm, of the bonds, together with other property, and the other was a release or transfer by S. B. Keyes to Mowry & Bend of all interest in the copartnership assets of Mowry, Keys & Bend. And, as stated by the learned counsel for the appellants, at the very instant of time when these instruments were being executed and delivered, Mowry & Bend were copartners with Keys as to these bonds and chargeable with notice of the ownership of the plaintiffs. Mowry was, therefore, as also substantially said by the counsel for the appellants, at the very time of taking the bonds, under notice that they did not belong to the person who was endeavoring to convey them to him, but belonged to another, and he therefore took no title at that time and never acquired any thereafter. The position of the defendants is one to which the observation of Lord ELLENBOROUGH applies. It is impossible to sever the individuality of the person and to say that, although Mowry & Bend had knowledge of the vice in the title in Keys to the bonds as copartners, yet, when they ceased to be copartners of Keys, they ceased to have knowledge. If it were otherwise, the individual, as a partner, would be severed from the individual as such, and the notice chargeable to him as a copartner would have no existence in him as an individual where the partnership relation was terminated. The learned counsel for the respondent thinks that the case of *Duncomb* v. *The New York, Housatonic and Western Railroad Company* (84 N. Y., 190), is an authority for the proposition that a disability, arising from the peculiar relations sustained by one party to another and growing out of such relations solely by operation of law, terminates when the relation ceases. An examination of that case leads to the conclusion that it has no applicability here, and for the reason that the transaction, considered in regard to a Mr. Rucker, who was the president of a company, and who in that capacity might be charged with notice, took place after he ceased to be president, and appears to have been an independent transaction after such presidency had expired. The court said:

" It was error to reject the bonds held by Rucker, as the assignee of the Loan and Indemnity Company, and those which he received as a pledge from the Bessemer Company. The transactions relating to these bonds occurred after he had ceased to be an officer of the railroad company, and when he occupied toward it no relation of trust or confidence which could on any theory expose his action to scrutiny or criticism. He dealt, therefore, like any other stranger, and is entitled to prove such of these bonds as he holds as pledgee and can produce for that purpose, and receive the dividends thereon to the amount of the debts, respectively, which the bonds were pledged to secure." It may be further said that it was held that the loan to which the pledge related was, under the charter of the company, valid and capable of being enforced. An examination of the cases cited by the counsel for the respondent, to the effect that the plaintiffs were estopped from setting up any claim to the bonds in consequence of their having paid the interest due upon them, does not sustain the proposition. It is not regarded as sound, therefore, in its application to this case. The action was brought within the time limited by law, and the company, save by the payment of interest, did no act indicating that they regarded the sale of the bonds as authorized and legal. This led to no damage to the defendants, and was in no way capable of being regarded as constituting the element of fraud in any possible aspect in which it might be viewed. The doctrine of estoppel does not, therefore, apply.

For these reasons, the judgment should be reversed and a new trial ordered, with costs to abide the event.

DANIELS, J., concurred.

Present — BRADY, P. J., DANIELS and BARKER, JJ.

Judgment reversed, new trial ordered, costs to abide event.