STEINWAY v. STEINWAY et al.

(Supreme Court, Appellate Division, First Department. March 6, 1896.)

1. CORPORATIONS — CONTRACT BETWEEN DIRECTOR AND STOCKHOLDERS — VALIDITY.
    The president and director of a manufacturing corporation, and another, by agreement with all the stockholders, formed a partnership to conduct a like business in another city, in such manner as to be substantially a branch house. The enterprise was a pressing necessity for the benefit of all concerned, including the stockholders, and involved considerable risk; and such partners agreed to assume such risk, and, when the business became a success, to turn it over to the corporation at cost price. *Held*, that such contract was valid and binding on the corporation and all the stockholders.

2. ESTOPPEL IN PAIS.
    The president and director of a corporation, and another, with the approval of all the stockholders, formed a partnership for the purpose of conducting the same business in another city, substantially as a branch house, and agreed with such stockholders that when the business proved profitable it should be turned over to the corporation at cost price. By reason of the existence of such branch house, the dividends on the stock of the corporation increased steadily and largely during a period of about nine years, when the partnership business was sold to the corporation. *Held*, that a stockholder who accepted the increased dividends on stock during such period was estopped from claiming that he did not consent to or ratify the contract between such firm and the corporation or stockholders.

3. SAME.
    A stockholder was estopped by such transfer from claiming that the contract was not binding on him and the corporation, and from claiming the profits realized by such firm out of the business.

4. SAME.
    The proposition which resulted in such transfer provided for the cancellation of all claims, of whatever kind and nature, against such firm. *Held*, that the corporation was estopped by the release which accompanied such transfer from claiming that the contract was not binding, and from claiming the profits realized by the firm in the business.

Appeal from special term.

Action by Henry W. T. Steinway against William Steinway and Steinway & Sons, a corporation, to compel William Steinway to pay to the corporation certain profits arising from certain transactions, including a sale by him to the corporation. From a judgment dismissing the complaint, entered on a decision of the court after trial at special term, plaintiff appeals. Affirmed.

For prior reports, see 22 N. Y. Supp. 945, and 26 N. Y. Supp. 657.

This action is brought by a stockholder of the corporation of Steinway & Sons, in behalf of himself and all other stockholders, to compel the defendant William Steinway, its president and one of its trustees and directors, to account for, and pay over to the corporation, certain profits alleged to have been illegally acquired through individual dealings with it. The corporation is joined as defendant because it refused to bring the action. The following facts are either undisputed, or are established by a decisive preponderance of evidence: In 1880 Steinway & Sons had a branch office in London, which was not profitable. Its nonsuccess was mainly due to the fact that the New York factories could not supply it cheaply enough with pianos, and that those manufactured here were not suited to the English climate, neither the wood nor the varnish lasting well in the moister atmosphere. In 1880 matters were brought to a crisis by the rise of American money, which decreased the purchasing power of British currency, and by a serious strike in the New York factories, which made it impossible to furnish the London house even so well as before. In this emergency, Theodore Steinway, the defendant William Steinway's brother, proposed to the stockholders that a copartnership be formed to establish a branch of the business in Hamburg, which could sell to the London house cheaper—and, for its purpose, better—instruments than had theretofore been furnished it, and which could aid and strengthen the New York house in time of labor troubles. In addition to these particular reasons, the extension of the business to Hamburg was manifestly desirable and advantageous. The risk, however, was considerable; and Theodore and William agreed to assume it personally, each supplying half of the capital. When the business became a success, it was to be turned over to the corporation at cost price. This plan met with the unanimous approval of all the stockholders, including the plaintiff. The copartnership thus formed was known as Steinway's Pianofabrik. From November, 1880, when the Fabrik went into operation, until December, 1889, when it went out of existence, the corporation sold to it, at certain special prices (of which the plaintiff now complains), such materials as it had occasion to get from this side of the water. Of these prices, however, plaintiff had full knowledge during the whole of the period. The Fabrik sold to the London house at from 20 to 45 per cent. cheaper than the prices at which the New York house had been able to consign the goods; and the London branch of the business quadrupled, and, from being scarcely self-supporting, became very lucrative. In 1889 Theodore died, leaving by his will his interest in the Fabrik, and all patents taken out by him in Europe, to the defendant William Steinway. The latter thereupon fulfilled to the letter his agreement with the corporation. A meeting of the trustees was held on December 29, 1889, at which he submitted an offer to transfer the business to the corporation for the amount of the capital invested therein, as shown by an inventory annexed, the correctness of which was guarantied. In addition to other concessions, not necessary to mention, this defendant agreed to transfer to the corporation all patents, whether taken out in Europe or America. Of these the corporations had been a licensee, paying royalties thereon. This offer was unanimously accepted, all the stock being voted on either personally or by proxy. The plaintiff was present, and made no objection. The minutes state that he participated in the discussion, but expressed no opinion upon the final vote. The arrangement was carried out, and the Hamburg house has ever since been part of the Steinway system. The offer contained the following provision: "(11) All claims that Steinway's Pianofabrik of Hamburg may have for commissions, spoiled or broken material furnished, or repairing Steinway & Sons' (of New York) pianos in Germany or Europe, for making good Steinway & Sons' warranties, if not already booked and allowed by said Steinway & Sons, against Steinway & Sons, New York, and also all claims by Steinway & Sons, of whatever kind and nature, against Steinway's Pianofabrik, if not already booked and allowed by said Steinway's Pianofabrik, be forever canceled and quitclaimed to each other, on the consummation of Steinway & Sons' purchase of Steinway's Pianofabrik under my within offer, by passing the resolution by Steinway & Sons' board of trustees at its meeting on the 26th day of December, 1889."

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, WILLIAMS, and PATTERSON, JJ.

Edward B. Hill, for appellant.
George W. Cotterill, for respondents.

BARRETT, J.   1. We agree with the plaintiff that an officer
and director sustains a trust relation towards the corporation, and
that a trustee is prohibited from dealing individually with himself,
in his trust capacity.   Such transactions are undoubtedly void-
able, at the option of the interested parties, whether fair or other-
wise.   Davoue v. Fanning, 2 Johns. Ch. 251; Munson v. Railroad
Co., 103 N. Y. 58, 8 N. E. 355.   But this general and wholesome
principle is entirely inapplicable to the facts of the present case.
The defendant William Steinway did not here attempt to represent
both sides.   He not only consulted the stockholders, but he dealt
directly with them.   They gladly assented to the enterprise, and
fully sanctioned all that was contemplated and proposed.   The en-
terprise was in fact a pressing necessity, inaugurated for their
benefit, and for the benefit of all concerned.   The rule applicable to
this state of facts was well stated by Follett, C. J., in Welch v.
Bank, 122 N. Y. 177, at page 189, 25 N. E. 269, as follows:

"If the contract so entered into is in all respects just, as between the par-
ties, and all of the shareholders and directors or trustees are competent to
assent, and, with full knowledge of the terms of the contract, do assent, and
direct that it be made, it is binding on the corporation, and cannot be avoided
by the shareholders."

To the same effect, Hotel Co. v. Wade, 97 U. S. 23, and Barr v.
Glass Co., 17 U. S. App. 124, 6 C. C. A. 260, 57 Fed. 86.   In thus
dealing with the stockholders, the trustee is dealing with the col-
lection of individuals constituting the corporation; and they may
make any bargain they please with him, or permit any act which
is not radically ultra vires.   Even if the directors misapply the
funds of the corporation, their acts in that regard may be cured
by the unanimous consent or ratification of the shareholders.   Mor.
Priv. Corp. § 625, and cases there cited.   So a transaction in which
the directors have no authority to represent the corporation, be-
cause personally interested in obtaining an advantage at the ex-
pense of the corporation, may subsequently be ratified, even by the
majority, if the transaction was not in fact fraudulent, or detri-
mental to the corporate rights.   Id. § 626, and cases there cited.
If the shareholders may thus ratify illegal acts of the trustees, they
may agree originally that such acts shall be lawful and proper.
And where they have done so the corporation cannot complain.
That is precisely this case, and the only question, therefore, is
whether the authorized enterprise was conducted fairly to the cor-
poration.   We have scrutinized the evidence on this head with
great care, and our conclusion is adverse to the plaintiff's conten-
tion.   The more the evidence is scrutinized, the clearer seems the
fairness and the correctness of the dealings between the corpora-
tion and the fabrik.   The plaintiff claims that he did not consent
to the system of charges made by the corporation to the fabrik,
but this claim is wholly without merit.   His conduct is incon-
sistent, throughout, with any other theory than that he assented to

this system and to these charges. Then, too, he participated in the resultant benefits of the system. During the whole period from 1880 to 1889, he accepted his dividends, which increased steadily from 6 per cent. to 18 per cent.,—an increase due largely to the success which the fabrik, under this very system, enabled the London house to achieve. His occasional expressions of dissatisfaction cannot weigh against such facts. The only definite and ⋅formal claim he made, with the exception of the formal demand which preceded the commencement of the action, was after Theodore Steinway's death, when he declared that the stockholders were entitled to be paid the amount of the decedent's profits in the firm. And it is significant that he dropped this claim on learning that he would receive as legatee under Theodore's will more than could possibly come to him as a stockholder. What he really wanted was, not to repudiate the whole affair (it was too advantageous for that), but to get all there was in it legitimately, and then something that was not. He assented to the entire transaction, profited by its operations, and resolved to retain its resultant benefits. These operations were not only just and fair in themselves, but they were directly and indirectly beneficial to the corporation and all its stockholders. The plaintiff, therefore, has no just cause of complaint.

2. The plaintiff is also concluded by the transfer of the fabrik and of the other property which accompanied it. This transfer was the consummation by the defendant William Steinway of his original agreement with the corporation. All that the plaintiff now complains of was then, and had long been, known to him and every other stockholder. If any intention existed of assailing the bargain, or of attempting to deprive the defendant Steinway of whatever incidental benefits he had realized under it, this was the last chance of asserting it. A cestui que trust is not, any more than another, exempted from the operation of those salutary rules of law which prohibit one from taking inconsistent positions with regard to a contract. If he decides to disaffirm an agreement made by the trustee, he must restore what he has received under it. Duncomb v. Railroad Co., 84 N. Y. 190; Barr v. Railroad Co., 125 N. Y. 263, 26 N. E. 145. If he learns in time of what has been done, he must make his election, like another, as to whether he will abide by the contract, and, if not, he may not receive benefits therefrom. As Judge Finch said in the Duncomb Case of the rule permitting the fiduciary to disaffirm (page 199), "The rule was adopted to secure justice, not to work injustice; to prevent a wrong, not to substitute one wrong for another." To permit the plaintiff here to benefit from the ownership by the corporation of the very valuable Hamburg plant, and the many other advantages surrendered by the defendant Steinway, and at the same time allow him to strip that defendant of every vestige of profit secured by the risk of capital and the labor of nine years, would be grossly unconscionable. It would, in fact, be a fraud upon the defendant William Steinway.

3. The corporation itself is also concluded by the release which accompanied the transfer. The proposition which resulted in this transfer provided for the cancellation of "all claims, of whatever

kind and nature, against Steinway's Pianofabrik"; that is, against those who constituted the fabrik. The context shows, it is true, that what was particularly in the minds of the parties was the book accounts. But there was no limitation, except where allowances had already been made upon the books. The words of release, save in this particular respect, are as broad as they well can be; and the intention that all other past liabilities, of whatever nature, should be wiped out, is undeniable. No special reference was made to the claim which is asserted in this action, for the obvious reason that the possibility of its assertion was not contemplated. It would, indeed, have been an affront to the proposer of such a transfer to suggest that the mutual releases which were to accompany his generous offer should specify a claim which could only be founded upon his lack of integrity. If at that time there was any stockholder of the corporation ungrateful enough to contemplate such a claim, he was sufficiently prudent to keep the thought to himself.

The views expressed render unnecessary a consideration of the plaintiff's delay in bringing suit, though the judgment might well rest upon the ground of inexcusable laches. Our decision, however, is based upon the demerits of the plaintiff's case. He has no independent equity, and that which he puts forward on behalf of the corporation is as weak as his own. As Mr. Justice Field remarked in Gas Co. v. Berry, 113 U. S. 322, at page 327, 5 Sup. Ct. 525:

"A court of equity does not listen with much satisfaction to the complaints of a corporation that transactions were illegal which had its approval, which were essential to its protection, and the benefits of which it has fully received."

None of the exceptions taken to the admission or exclusion of evidence deserve special mention. Upon the whole case, there could have been no other just result than that which was arrived at by the learned judge at special term; and the judgment appealed from should therefore be affirmed, with costs. All concur.