In the Matter of the Application of ERIE RAILROAD COMPANY, JOHN A. HADDEN and Another, as Trustees of the Property of ERIE RAILROAD COMPANY, and BANKERS TRUST COMPANY, Petitioners, for an Order under Article 78 of the Civil Practice Act to Review a Determination of the STATE TAX COMMISSION, Respondent.

Third Department, July 2, 1940.

*Whalen, McNamee, Creble & Nichols [Robert E. Whalen of counsel], for the petitioners.*

*John J. Bennett, Jr., Attorney-General [Henry Epstein, Solicitor-General; Edward J. Gretchen, Assistant Attorney-General, of counsel], for the respondent.*

BLISS, J.   Section 253 of the Tax Law imposes on each mortgage on real property situated within the State, recorded on or after the 1st day of July, 1906, a tax of fifty cents for each one hundred dollars and each remaining major fraction thereof of principal debt or obligation which is or under any contingency may be secured at the date of the execution thereof or any time thereafter, by such mortgage.   Section 259 of the same law provides that in the case of mortgages made by corporations in trust to secure payment of bonds or obligations issued or to be issued thereafter, if the total amount of principal indebtedness which under any contingency may be advanced or accrued or which may become secured by any such mortgage has not been advanced or accrued thereon or become secured thereby before such mortgage is recorded, it may contain at the end thereof a statement of the amount which at the time of the execution and delivery thereof has been advanced or accrued thereon, or which is then secured by such mortgage; thereupon the tax payable on the recording of the mortgage shall be computed on the basis of the amount so stated to have been so advanced or accrued thereon or which is stated to be secured thereby. This section further provides: " Whenever a further amount is to be advanced under the original mortgage, or shall accrue thereon or become secured thereby, the corporation making such mortgage shall pay the tax on such amount at or before the time when such amount is to be advanced, accrues or becomes secured   *   *   * and the certification of any bond or bonds by the trust mortgagee shall be deemed an advance under this article."

On December 1, 1916, the Erie Railroad Company executed and delivered to the Bankers Trust Company as trustee, its refunding and improvement mortgage for $500,000,000.   From time to time thereafter it issued under this mortgage series A bonds in the aggregate amount of $15,000,000 authenticated by the trustee

and maturing in 1937 and series B bonds maturing in 1938, in the aggregate amount of $25,000,000, both bearing interest at the rate of six per cent. The railroad also filed with the recording officer statements showing that there had been advanced and certified under and secured by said mortgage, bonds in the aggregate amount of $40,000,000 consisting of $15,000,000 series A and $25,000,000 series B, on all of which the mortgage tax was paid at or before the times when said bonds were certified and delivered. $2,700,000 of the series B bonds never left the treasury of the railroad although the mortgage recording tax had been paid thereon. The remainder of the series A and series B bonds were all issued in temporary form and without interest coupons attached. They were pledged at different times by the railroad as collateral security for the payment of its notes held by various creditors. From time to time many of the bonds thus pledged were returned to the railroad, some of them subdivided into equivalent amounts of temporary bonds of smaller denominations and the temporary bonds thus returned or the temporary subdivisions thereof were either repledged with the same creditors or pledged to other creditors.

In June, 1927, the railroad issued and sold to J. P. Morgan & Co. an additional $50,000,000 series of 1927 bonds under this mortgage, which were authenticated and delivered by the trustee to the railroad and thereafter delivered by the railroad to Morgan & Co. This issue matures in 1967 and bears interest at five per cent.

At that time series A and series B bonds to the amount of $31,821,000 were in the hands of the railroad's creditors as security for the payment of its notes totaling $21,649,450 and $8,179,000 in the railroad's treasury. Upon the sale of the series of 1927 bonds to Morgan & Co. the proceeds of the sale were paid by the purchaser to the railroad, which then used the money to pay its notes in full. The noteholders returned to the railroad the series A and series B bonds which they held as security, and all of the series A and series B bonds were retired by the railroad. The remainder of the proceeds from the sale of the series of 1927 was used by the railroad for other corporate purposes. The railroad paid the mortgage recording tax on $10,000,000 of the series of 1927 bonds and claimed exemption of the remaining $40,000,000 from the payment of such tax. It is conceded by the respondents that no tax is due on $2,700,000 of these bonds, which is the amount of series B bonds that never left the treasury of the railroad. Our question is as to the mortgage recording tax on the remaining $37,300,000 of series of 1927 bonds.

The series of 1927 bonds were authenticated by the trustee before their sale and delivery and a statement was filed by the railroad with the recording officer under section 259 of the Tax Law on June 2, 1927. This statement was to the effect that there had been advanced and certified under and secured by the mortgage, bonds in the aggregate amount of $40,000,000 consisting of $15,000,000 series A and $25,000,000 series B, on all of which the mortgage tax was paid when the bonds were certified and delivered and that these bonds were now to be retired and canceled and replaced by $40,000,000 of bonds series of 1927 about to be issued under such mortgage, which new bonds would be delivered to the holders of series A and series B bonds in lieu and substitution therefor and upon which no tax would be payable. Also a supplemental agreement under the original mortgage, supported by appropriate corporate resolutions, was made by the railroad in connection with the issuance of the series of 1927 bonds. It provided that $40,000,000 of the series of 1927 bonds were to be exchanged or substituted for an equivalent principal amount of the series A and series B bonds. Nevertheless when it came time to dispose of the series of 1927 bonds, an offer for the purchase thereof was made by J. P. Morgan & Co., and accepted by the railroad although Morgan & Co. did not then hold any of the series A or series B bonds either as owner or pledgee. The majority of the pledged series A and series B bonds were then held by the United States of America or government agencies as security for the railroad company's notes.

The series of 1927 bonds clearly come within and are taxable under the provision of sections 253 and 259 of the Tax Law. There was a new principal debt or obligation created by their issuance and sale and this amount was secured by the underlying mortgage. It was a further amount advanced under the original mortgage and which became secured thereby. The series of 1927 bonds were not in fact exchanged or substituted for the bonds of the previous issues and the statements to that effect by the railroad were not correct. They were sold and delivered to a new creditor under a contract of purchase and sale with such creditor and not with the creditors of the railroad who then held the previous issues as collateral. Furthermore the statute says that the certification of any bond or bonds shall be deemed an advance under this article. Such certification has been held to impose upon the trustee a personal liability for the payment of the tax. (*People* v. *Trust Co. of America*, 205 N. Y. 74; 208 id. 463.) This statute created a presumption that the 1927 issue constituted the advance of an amount secured by the mortgage (*Matter of Barbour*, 185 App.

Div. 445; affd., without opinion, 226 N. Y. 639) and the transaction itself admits of no other conclusion.

The petitioners contend that because no default had occurred in the railroad's obligations for performance of which the series A and series B bonds had been pledged, those bonds never represented any debt. They say that at all times title was in the railroad, subject to the liens of the pledgees, and as there was no default, there was no obligation within the meaning of the statute. With this contention we are constrained to disagree.

The series A and series B bonds had actually been authenticated by the trustee and the statements filed by the railroad under section 259 admitted the previous advances and that they were secured by the mortgage. These bonds had been issued and delivered by the railroad to its creditors and were outstanding railroad obligations at the time of the issue of 1927. The bonds were none the less enforcible because in the hands of a pledgee. (*Duncomb* v. *N. Y. H. & N. R. R. Co.*, 84 N. Y. 190; *Bankers Trust Co.* v. *Denver Tramway Co.*, 233 id. 604; *Guaranty Trust Co. of N. Y.* v. *Minneapolis & St. L. R. Co.*, 52 F. [2d] 418.)

Between November, 1917, and September, 1926, series A and B bonds were pledged by the railroad to secure payment of debts totaling over $60,000,000. Had they been mere debentures, they would have added nothing to the obligations already given. It was the underlying mortgage which made payment more certain to the pledgees. Otherwise the pledging of the bonds was just an idle gesture. We must attach to a business transaction the usual significance of business men in the practical conduct of their affairs. They took these particular bonds in pledge because through them they obtained added protection in the form of the mortgage. They could look to the property covered by the mortgage for the payment of their debts if the personal obligation proved worthless. To say that this transaction did not have such result is to deny the common understanding of business men.

" The bonds have a twofold character and purpose: When properly sold by the railway company they become evidence of a debt owed by the railway company to the amount indicated by the face of the bonds; second, they are evidence that the holder of the bonds has a right to share in the proceeds of the security covered by the mortgage accompanying the bonds. The trust company, in taking these bonds as collateral, did not acquire any right in them whatever as evidence of a debt owed by the railway company. They evidenced no debt, for they had not been sold. But it did acquire an interest in the bonds as evidence of a right on the part of the holder to participate in the mortgage

security. The debt owed by the railway company to the trust company was evidenced by the note in the hands of the trust company, and by that alone. The property covered by the consolidated mortgage was made the security for that note by the pledging of the bonds, and the extent to which the trust company might participate in the proceeds of that mortgaged property was determined by the amount of the bonds so held as collateral, limited, however, by the amount of the note itself." (*Mississippi Valley Trust Co.* v. *Railway Steel Spring Co.*, 258 Fed. 346, 354.)

The tax is measured by the amount of principal debt which is, or under any contingency may be secured by the mortgage. (Tax Law, § 253.) This mortgage was in fact security for the debts represented by the notes. (*Easton* v. *German-American Bank*, 127 U. S. 532.) The creditors who held the bonds as collateral might participate in distribution of the mortgaged property up to the amount of bonds pledged, but not to exceed the amount of the debts. The mortgage was security up to the face amount of the bonds pledged and upon default the noteholders would have shared in the proceeds of the mortgaged premises up to the amount of their debts. (*Duncomb* v. *N. Y. H. & N. R. R. Co.*, supra; *Mississippi Valley Trust Co.* v. *Railway Steel Spring Co.*, supra.) The debts owing the railroad's creditors were actually secured by the mortgage within the purview of section 253 of the Tax Law.

The transaction of June, 1927, does not come within the rulings of *Matter of New York State Gas & Elec. Corp.* v. *Gilchrist* (209 App. Div. 771; affd., 240 N. Y. 552) and *People ex rel. Boston & Maine Railroad* v. *Loughman* (227 App. Div. 361; affd., 254 N. Y. 513). The new bonds did not go to the old bondholders. There was a new creditor, a new loan and a new contract relationship. The old noteholders and their debts were paid and those debts extinguished. The payment of one mortgage by a new agreement is taxable even though made with the same mortgagee. (*People ex rel. U. S. Title G. Co.* v. *Tax Comm.*, 230 N. Y. 102.) As there stated, " there is a new transaction with a new tax." The significant fact here is that there was a new debt for which the mortgage became security.

The determination of the State Tax Commission should be modified by deducting from the amount of tax $6,566.19, with interest, being the tax on $2,700,000 of principal debt or obligation secured by the mortgage, and as so modified, and in all other respects the determination should be confirmed, with fifty dollars costs and disbursements to the petitioners.

HILL, P. J., and CRAPSER, J., concur; SCHENCK and FOSTER, JJ., dissent, SCHENCK, J., in an opinion in which FOSTER, J., concurs.

SCHENCK, J. (dissenting). Erie Railroad Company, its trustees in reorganization under the National Bankruptcy Act and the trustee of its refunding and improvement mortgage have instituted this proceeding, under article 78 of the Civil Practice Act, to review so much of a determination of the State Tax Commission as imposed, with respect to $40,000,000 of the Erie's five per cent bonds, series of 1927, secured by the mortgage, a mortgage recording tax of $97,277, with interest thereon, exacted under section 258 of the Tax Law, at one-half of one per cent per month from June 3, 1927, it having been stated on the argument that such interest, covering a period of some thirteen years, amounts to nearly $77,000. With respect to an additional $10,000,000 of the same series of bonds no question is raised but that the Commission properly assessed a tax of $24,319 which the Erie has paid.

While the facts involved, as developed at the hearing before the Commission, are unusually complicated in their details, those which are really material to a decision of the case are within rather narrow compass and readily capable of adequate summarization. The record made before the Commission discloses that series A bonds in principal amounts aggregating $15,000,000, certified by the trustee, authorized by Erie in 1917 and maturing in 1937, and also series B bonds in principal amounts aggregating $22,300,000, likewise certified by the trustee, successively authorized by Erie from time to time during the years 1919, 1920 and 1924, and maturing in 1938 (the bonds of both series being in temporary form with no interest coupons attached), were pledged by Erie at various dates over a period of years, extending from November, 1917, to September, 1926, as collateral security for payment of certain of Erie's notes which were held by the pledgees. The mortgage recording tax was paid upon all of the series A and series B bonds thus certified, authorized and pledged, as well as the tax on $2,700,000 of series B bonds which never left Erie's treasury. Numerous bonds thus pledged were returned by the pledgees thereof on different occasions to Erie, which in certain instances subdivided some of the bonds thus returned into equivalent principal amounts of temporary bonds of smaller denominations, and the temporary bonds thus returned, or the subdivisions thereof in temporary form, were in some instances repledged by Erie with the same creditors or pledged anew to still others, all of which is set forth in detail in Exhibits 23 and 24, constituting part of the return made by the Commission to the order under review.

Exhibit 23, as explained by the testimony of Erie's treasurer before the Commission, shows that while initially thirty-one temporary series A bonds were certified by the trustee and pledged by Erie in principal amounts aggregating $15,000,000, by 1925 a total of 125 of temporary series A bonds had been certified and pledged or repledged. In June, 1927, the series A bonds were held as follows:

| | |
|---|---|
| Pledged with Guaranty Trust Company of New York. | $4,618,000 |
| Pledged with United States of America. | 7,182,000 |
| In Erie's treasury, unpledged. | 3,200,000 |
| Total series A bonds. | $15,000,000 |

Exhibit 24, likewise explained by Erie's treasurer, shows that while initially ninety-four temporary series B bonds were certified by the trustee and pledged by Erie in principal amounts aggregating $22,300,000, by 1926 a total of 130 temporary series B bonds had been certified and pledged or repledged, but $2,700,000 of series B bonds never left Erie's treasury. In June, 1927, the series B bonds were held as follows:

| | |
|---|---|
| Pledged with Guaranty Trust Company of New York. | $8,470,000 |
| Pledged with United States of America. | 10,538,000 |
| Pledged with First National Bank of New York. | 1,013,000 |
| In Erie's treasury, unpledged. | 4,979,000 |
| Total series B bonds. | $25,000,000 |

Justice BLISS states that " the majority of the pledged series A and series B bonds were then held by the United States of America or government agencies; " but the record shows that only $7,182,000 of the total of $15,000,000 of series A bonds and only $10,538,000 of the total of $25,000,000 of series B bonds were thus held in June, 1927.

On June 3, 1927, the series A and series B bonds thus pledged amounted in all to $31,821,000, as set forth in the following tabulation:

| Pledgee | Series A | Series B | Total |
|---|---|---|---|
| Guaranty Trust Company of New York. | $4,618,000 | $8,470,000 | $13,088,000 |
| Federal government. | 7,182,000 | 10,538,000 | 17,720,000 |
| First National Bank of New York. | | 1,013,000 | 1,013,000 |
| | $11,800,000 | $20,021,000 | $31,821,000 |

How the series A and series B bonds were held on June 3, 1927, and the indebtedness which they partly secured may be tabulated thus:

| Pledgee | Series A and series B bonds held in pledge | Indebtedness partly secured thereby |
|---|---|---|
| Guaranty Trust Company of New York | $13,088,000 | $8,725,000 |
| Federal government | 17,720,000 | 11,574,450 |
| First National Bank of New York | 1,013,000 | 1,350,000 |
| | $31,821,000 | $21,649,450 |
| Held in Erie's treasury | 8,179,000 | |
| Total series A and series B bonds | $40,000,000 | |

While Justice BLISS concedes that, in case of default, the note-holders could enforce the bonds " but not to exceed the amount of the debts," he would tax again at par value $31,821,000 of bonds which were held to secure only $21,649,450 of notes.

In 1927, Erie found it possible to substitute and exchange for all of its series A and series B bonds, bearing six per cent interest and aggregating $40,000,000 in principal amount, an equivalent amount of series of 1927 bonds bearing five per cent interest and maturing some thirty years later. Accordingly, as permitted by article eleven of the mortgage, Erie and the trustee agreed upon a supplement thereto, providing for such substitution and exchange, to be effective upon the surrender and delivery, by the Erie to the trustee, of series A and series B bonds for cancellation, whereupon an equivalent amount of series of 1927 bonds, certified by the trustee, was to be delivered to Erie.

With the approval of its stockholders and in accordance with resolutions adopted by its board of directors, Erie took steps to create an issue of five per cent bonds under the mortgage, as thus amended by the supplement thereto, in an authorized principal amount of $50,000,000, to bear date May 1, 1927, and to mature forty years after date. The resolutions of the directors recited the purposes of such issue to be, as to $40,000,000 thereof, to exchange and substitute them for an equivalent principal amount of the series A and series B bonds; the remaining $10,000,000 thereof to be issued for the acquisition of new property, for additions and betterments to property already owned by Erie and to reimburse Erie for various expenditures. Those resolutions further

provided for securing the return to Erie's treasury of such of the series A and series B bonds as were not then held therein, "so that the entire $15,000,000 of Series A and the entire $25,000,000 of Series B bonds may be exchanged for the proposed $40,000,000 of " series of 1927 bonds.

Resolutions thereafter adopted by Erie's directors, an application to the Interstate Commerce Commission for authorization of the proposed issue of $50,000,000 of series of 1927 bonds and the Interstate Commerce Commission's report and order granting such authorization, all specified that $40,000,000 thereof were to be issued in exchange or substitution for an equivalent principal amount of series A and series B bonds owned by Erie, of which $31,821,000 were pledged as collateral for notes of Erie, while the balance of $8,179,000 were held in its treasury.

On June 3, 1927, in furtherance of an arrangement whereby Erie's notes, as collateral to which the series A and series B bonds had been pledged, would be paid, many of them in advance of the maturity dates of the notes, the pledgees of those bonds produced at the office of the trustee the $31,821,000 of series A and series B bonds held by them, which, together with the $8,179,000 held in Erie's treasury, were delivered to the trustee. Thereupon the trustee certified and delivered to J. P. Morgan & Co., for Erie's account, two temporary five per cent series of 1927 bonds, one for $40,000,000 in exchange and substitution for an equivalent principal amount of series A and series B bonds, and the other for $10,000,000, the trustee taking Erie's receipt for both. It was only upon the delivery by Erie of the $40,000,000 of series A and series B bonds to it, a prerequisite stipulated in the supplement to the mortgage, that the trustee certified and delivered to Erie the temporary bond for $40,000,000 in principal amount of the series of 1927. J. P. Morgan & Co. credited Erie's account with the proceeds of sale, at ninety-one and one-half of the $50,000,000 series of 1927 bonds amounting, with accrued interest, to $45,944,971.48, a sale which the Interstate Commerce Commission had authorized and approved. Against the proceeds of sale thus placed to its credit, Erie drew its checks upon J. P. Morgan & Co. in favor of the respective pledgees of the series A and series B bonds for a total of $21,649,450, the amounts due for principal and interest upon Erie's notes, payment of which had been partly secured by the pledge of the series A and series B bonds. With the exchange and substitution accomplished, the series A and series B bonds were canceled and thereafter they were cremated jointly by Erie and the trustee. Upon the $10,000,000 of series of 1927 bonds, which were not issued in exchange and substitution

for those of series A and series B, Erie paid an estimated mortgage recording tax of $23,951.80, which the Commission, as the result of the apportionment hearing held in accordance with section 260 of the Tax Law, found to have been an underpayment of $367.19, a deficiency which appears without dispute to have been since paid.

The statute pertinent to this controversy is section 259 of the Tax Law, as last amended in 1917, which, so far as material, provides:

" Trust Mortgages. In the case of mortgages made by corporations in trust to secure payment of bonds or obligations issued or to be issued thereafter, if the total amount of principal indebtedness which under any contingency may be advanced or accrued or which may become secured by any such mortgage which is subject to this article has not been advanced or accrued thereon or become secured thereby before such mortgage is recorded, it may contain at the end thereof a statement of the amount which at the time of the execution and delivery thereof has been advanced or accrued thereon, or which is then secured by such mortgage; thereupon the tax payable on the recording of the mortgage shall be computed on the basis of the amount so stated to have been so advanced or accrued thereon or which is stated to be secured thereby. * * * Whenever a further amount is to be advanced under the original mortgage, or shall accrue thereon or become secured thereby, the corporation making such mortgage shall pay the tax on such amount at or before the time when such amount is to be advanced * * * and the certification of any bond or bonds by the trust mortgagee shall be deemed an advance under this article."

There is presented for determination the simple question whether, by exchange and substitution of the $40,000,000 of series of 1927 bonds for an equivalent amount of series A and series B bonds, a further amount was advanced and became secured by the mortgage. The Attorney-General, both in an opinion which he rendered to the Commission for its guidance in this case and in his brief before this court, holds that the question is determinable by *People* v. *Boston & Maine Railroad* (202 App. Div. 54; affd., without opinion, 234 N. Y. 629), commonly called the first *Boston and Maine* case. Petitioners, on the other hand, maintain that this case is controlled by *Matter of New York State Gas and Elec. Corp.* v. *Gilchrist* (209 App. Div. 771; affd., 240 N. Y. 552, on opinion below) and by *People ex rel. Boston & Maine Railroad* v. *Loughman* (227 App. Div. 361; affd., without opinion, 254 N. Y. 513), otherwise known as the second *Boston and Maine* case.

In approaching solution of the problem, one is confronted at the outset with the necessity of considering the status of the notes held by Erie's creditors and of the bonds pledged as collateral for their payment. Strictly speaking, the execution and delivery by a debtor to his creditor of additional obligations of the debtor does not in any legal sense constitute "collateral security," a term ordinarily used to designate a pledge of incorporeal personalty, as distinguished from a pledge of corporeal chattels; "for a debtor cannot, by adding another obligation of his own to that which he is already obligated to pay, create a second obligation as collateral to the first." (*Mercantile Factors Corp.* v. *Warner Bros. Pictures, Inc.*, 215 App. Div. 530, 534; affd., 244 N. Y. 504; *Matter of Waddell-Entz Co.*, 67 Conn. 324; 35 A. 257; Jones on Collateral Securities [3d ed.], § 1.) However, the propriety of Erie's action in thus pledging its bonds is not challenged, nor could it be in view of the generally recognized power of a corporation to pledge its bonds as security for a corporate debt. (4 Cook on Corporations [8th ed.], § 763; 3 Thompson on Corporations [3d ed.], § 2385; Jones on Collateral Securities [3d ed.], § 74; *Duncomb* v. *N. Y., H. & N. R. R. Co.*, 84 N. Y. 190; *Westinghouse Elec. & Mfg. Co.* v. *Brooklyn R. T. Co.*, 256 Fed. 465.) But Erie continued to own the pledged bonds, having a general property therein, subject, however, to the liens of the pledgee, who had only a special property in the bonds. (Jones on Collateral Securities [3d ed.], § 7; *Cortelyou* v. *Lansing*, 2 Caines' Cases, 200; *White* v. *Platt*, 5 Den. 269; *Farwell* v. *Importers & Tr. Nat. Bank*, 90 N. Y. 483; *Donnell* v. *Wyckoff*, 49 N. J. L. 48; 7 A. 672.) These authorities amply sustain petitioners' contention with which Justice BLISS is "constrained to disagree."

Between each of the pledgees of the bonds and Erie the relation was that of trustee and *cestui que trust*. (*Gillet* v. *Bank of America*, 160 N. Y. 549; *Toplitz* v. *Bauer*, 161 id. 325; *First Trust & Deposit Co.* v. *Potter*, 155 Misc. 106, 110–112 and cases cited.) Any negotiations of the bonds by a pledgee thereof while the notes were not in default would have constituted a conversion of the bonds. (Jones on Collateral Securities [3d ed.], § 571-a; *Wood* v. *Fisk*, 215 N. Y. 233; *Douglas* v. *Carpenter*, 17 App. Div. 329.) Had default occurred, however, in payment of the notes, the holders thereof could have sued thereon at law, since acceptance of the bonds as collateral did not suspend the remedy of a pledgee against Erie, once the debt evidenced by the notes fell due. (*Wheeler* v. *Newbould*, 16 N. Y. 392.) Or, waiving the right thus to sue at law, such a pledgee could either maintain a suit in equity for a sale of the bonds on foreclosure of its lien, or sell the bonds on

notice to Erie. (*Queen* v. *Fryer*, 232 App. Div. 222; *Stern & Co., Inc.*, v. *Pizitz*, 240 id. 509.) " In addition to proceeding personally against the pledgor for his debt without selling his pledge, the pledgee has his election of two remedies upon the pledge itself. He may file a bill in the nature of a foreclosure suit and proceed to a judicial sale or he may sell without judicial process upon giving reasonable notice to the pledgor to redeem and of the intended sale." (21 R. C. L. p. 685, § 46.)

Upon the bonds thus pledged with the noteholders Erie owed nothing; they evidenced no debt secured by the mortgage; having never been sold or otherwise disposed of, except by way of pledge as collateral for the notes, they bore no coupons; and because Erie owed nothing upon the bonds when they were surrendered by the respective pledgees to Erie on June 3, 1927, no interest was paid thereon. Petitioners contend, and it is not disputed, that neither in its original form nor as amended by the supplement did the mortgage contain any provision securing the notes to which the bonds were pledged as collateral. Hence, the notes could not, in the words of section 259 of the Tax Law, " under any contingency * * * become secured by " the mortgage. All that the pledge of the bonds vouchsafed to a noteholder was the right to have them applied in payment of any past due notes, coupled with a liability to account to Erie for any surplus remaining after disposition of the bonds. (*Gillet* v. *Bank of America*, 160 N. Y. 549, 560.) As the pledge of the bonds imported merely a conditional delivery, to become effective only after default in payment of the notes (Neg. Inst. Law, § 35; 3 R. C. L., p. 861, § 43), the transaction gave rise to a lien upon the pledged bonds, and nothing more. " There was no conveyance of legal title upon an express condition subsequent but delivery of personal property by a debtor, in security for a debt, accompanied by a written agreement whereby the debtor agreed that, if he did not pay the debt by a certain time, the creditor might dispose of the property to pay the debt." (*Turner* v. *Met. Trust Co.*, 207 Fed. 495, 500.) Where a railway company had pledged its mortgage bonds to secure its note which a trust company held, the Circuit Court of Appeals for the Eighth Circuit said: " The bonds have a twofold character and purpose: When properly sold by the railway company they become evidence of a debt owed by the railway company to the amount indicated by the face of the bonds; second, they are evidence that the holder of the bonds has a right to share in the proceeds of the security covered by the mortgage accompanying the bonds. The trust company, in taking these bonds as collateral, did not acquire any right in them whatever as evidence

of a debt owed by the railway company. They evidenced no debt, for they had not been sold. But it did acquire an interest in the bonds as evidence of a right on the part of the holder to participate in the mortgage security. The debt owed by the railway company to the trust company was evidenced by the note in the hands of the trust company, and by that alone. The property covered by the consolidated mortgage was made the security for that note by the pledging of the bonds, and the extent to which the trust company might participate in the proceeds of that mortgaged property was determined by the amount of the bonds so held as collateral, limited, however, by the amount of the note itself." (*Mississippi Valley Trust Co.* v. *Railway Steel Spring Co.*, 258 Fed. 346, 354.)

No debt, then, having been evidenced by pledge of the series A and series B temporary bonds, it is manifest that no " further amount " (Tax Law, § 259) was advanced under or became secured by the mortgage when $40,000,000 of series of 1927 bonds were issued in exchange and substitution for an equivalent amount of the pledged bonds. Therein lies the distinction between this case and the first *Boston and Maine* case, where an old debt, evidenced by bonds in respect of which the tax had been paid, was discharged by the retirement of the earlier bonds, and a new debt, evidenced by the issuance of later bonds, had come into existence, a distinction upon which this court dwelt in the *New York State Gas and Electric* case (p. 774) and again in the second *Boston and Maine* case (p. 362), both of which Justice BLISS would distinguish from our case.

In the first *Boston and Maine* case the new bonds were sold for cash and the proceeds of sale were applied in payment of an equal amount of the old bonds; while in this case no cash transaction entered into the exchange or substitution of $40,000,000 of series of 1927 bonds for an equal amount of the old bonds, every one of which was owned by Erie, free from any pledge, as soon as the $31,821,000 thereof which had been hypothecated were released by the pledgees to Erie which delivered them to the trustee, along with the $8,170,000 of old bonds held in Erie's treasury. In that case Presiding Justice COCHRANE observed that the " transaction was in no sense an exchange of bonds. The new bonds were placed on the market and the proceeds thereof used to pay and discharge the old bonds;" while in this case the proceeds of sale of the new bonds were not used to pay or discharge the old bonds, because upon the old bonds nothing was due. In that case, to quote COCHRANE, P. J., again: " An old debt or obligation existed in respect to which the tax was formerly paid. A new debt or obligation has now come into existence which is equally subject to taxa-

tion;" while in this case a tax was paid, not upon the notes which were not secured by the mortgage, but upon certification of the old bonds on which not a dollar had ever become due. In that case, as Justice HASBROUCK remarked when the second *Boston and Maine* case was before this court, the decision turned upon the fact that the new bonds evidenced a new debt secured by the same mortgage; while in this case, since no debt, secured by the mortgage, had been created or evidenced by the issuance of the old bonds, it follows of necessity that no new debt, likewise secured by the mortgage, was incurred or evidenced by the issuance of the new bonds.

In the *New York State Gas and Electric* case the mortgage was executed to secure an unlimited amount of bonds, as is true of the amended mortgage in this case up to three times the par value of Erie's capital stock outstanding and fully paid. In that case the holders of the outstanding bonds had agreed with the company to replace old bonds with a new issue; while in this case Erie and the trustee, by amendment to the mortgage, provided that upon Erie's delivery of old bonds to the trustee the latter, in exchange therefor, would certify and deliver to Erie an equivalent principal amount of new bonds. In that case, as in this, the old bonds, with several years yet to run, were replaced by new bonds bearing still later maturity dates and a lower rate of annual interest. In that case this court declared that " the transaction was entirely consistent with the terms of the mortgage, which, while they did not require, nevertheless fully sanctioned the issuance of bonds ' for the purpose of refunding or replacing ' bonds previously issued when such bonds should ' be cancelled, paid, redeemed or deposited;' " and in this case the process of exchange and substitution adhered to the procedure prescribed by the second supplement to the mortgage which entitled Erie, upon surrender and delivery of old bonds to the trustee, to receive from the trustee new bonds bearing the trustee's certification. In that case " exchanges of new bonds for old were thereupon made " and the old bonds were canceled, just as, after certification of the new bonds by the trustee and delivery thereof to J. P. Morgan & Co. for Erie's account, the old bonds were canceled and cremated. In that case, as Justice HASBROUCK took pains to point out when writing in the second *Boston and Maine* case, Justice HENRY T. KELLOGG had laid stress upon the fact " that there had been an exchange or substitution of bonds contemplating no new debt; " precisely as " no new debt " was or could have been contemplated by the issuance of new bonds in this case, inasmuch as no debt had been incurred or evidenced by the issuance of the old bonds.

In the second *Boston and Maine* case, which indicates that the company had learned a lesson from its first case and had taken a leaf from the *New York State Gas and Electric* book, it was emphasized that " The scheme of the trust mortgage, the plan and reorganization agreement, the resolution of the board of directors, the notice to bondholders, the assent of the bondholders, and the order of the Massachusetts Department of Public Utilities all * * * contemplate an exchange of bonds." So, too, in this case just such an exchange and substitution of bonds was contemplated by the supplement amending the mortgage, various resolutions of Erie's directors, the correspondence between Erie and J. P. Morgan & Co., Erie's application to the Interstate Commerce Commission for authority to issue the new bonds, the Interstate Commerce Commission's report and order approving the application and Erie's requisition upon the trustee for certification and delivery of the new bonds in exchange and substitution for the old. In that case this court recognized that, as in this case, there was a direct substitution of new bonds for an aggregate equivalent amount of the old. No new debt was discernible in that case, nor is it possible in this case to spell out a new debt in the sense of one secured by the mortgage in place of an old debt likewise secured. In that case it was " established * * * by the record * * * that there was an exchange or substitution of securities made in accordance with an agreement between the bondholders and the consolidated company; " and in this case there was an exchange or substitution made pursuant to agreement between Erie, which owned the bonds, and the trustee. In that case *People ex rel. Banner Land Co.* v. *State Tax Commission* (244 N. Y. 159) was invoked as authority for this court's ruling that no further amount was advanced when the new bonds were issued in exchange or substitution for the old; while in this case no further amount was advanced when $40,000,000 of series of 1927 bonds were issued in exchange or substitution for an equivalent amount of series A and series B bonds. In his concurring opinion in that case Presiding Justice VAN KIRK said that the question presented was " simply whether or not, by substitution of the new consolidated bonds for these underlying bonds, a further amount is advanced and has become secured by the original mortgage." No different question is before us now.

In reaching its determination, concededly erroneous in so far as it fixed a tax with respect to new bonds issued in exchange for the $2,700,000 of series B bonds which had always remained in Erie's treasury, the Commission may have been influenced by that clause in section 259 of the Tax Law which prescribes that certification

of bonds by the trustee under a mortgage " shall be deemed an advance," a provision upon which Justice BLISS lays stress. But in his brief before us the Attorney-General regards that provision as " simply an indication of the time of the payment of a tax which the Legislature had the right to specify." Such tax, however, is " to be measured by the total debt secured." (*People ex rel. U. S. Title G. Co.* v. *Tax Comm.*, 230 N. Y. 102, 104; quoted in the first *Boston and Maine* case, at pp. 55, 56.) Hence, if no debt created or evidenced by the old bonds was secured by the mortgage, no tax accrued when the old bonds were certified by the trustee, so that the amount already paid by way of tax on the $40,000,000 of series A and series B bonds exonerates Erie from any liability for a tax with respect to an equivalent amount of series of 1927 bonds. The situation is no different from what it would have been had Erie never parted with possession of the series A and series B bonds but had continued to hold them in its treasury until favorable market conditions made it possible to substitute, in exchange therefor, an issue of bonds maturing at a later date and bearing meanwhile a lower rate of interest.

On principle and authority, therefore, the determination of the Commission, in so far as it has been brought up for review, should be annulled, with fifty dollars costs and disbursements to petitioners.

FOSTER, J., concurs.

Determination modified by deducting from the amount of tax $6,566.19, with interest, and as so modified in all other respects confirmed, with fifty · dollars costs and disbursements to the petitioners.