SWAN v. STILES.

(Supreme Court, Appellate Division, Fourth Department. May 3, 1904.)

1. INSOLVENT CORPORATION—PREFERENCE—STATUTE—EVIDENCE.

In an action by the receiver of an insolvent corporation to require a purchaser of the corporation property at a foreclosure sale to account therefor under the stock corporation law (Laws 1892, p. 1838, c. 688, § 48), evidence examined, and *held* insufficient to show that the execution of the mortgage was with the intent of giving a preference, though the corporation was insolvent at the time the mortgage was given.

2. SAME—MORTGAGE—CONSENT OF STOCKHOLDERS—STATUTE.

Under the stock corporation law (Laws 1892, p. 1825, c. 688, § 2), requiring the giving of a mortgage to be with the consent of the stockholders owning two-thirds of the stock, stock absorbed by the corporation at the time of the granting of the consent is not included in making the calculation.

87 N.Y.S.—69

3. SAME—RECEIVER—RECOVERY OF PROPERTY—CONDITION PRECEDENT.

The receiver of an insolvent corporation cannot regain the property of the corporation from a purchaser at foreclosure sale unless he restores to the purchaser what he paid for the property.

4. COSTS—EXTRA ALLOWANCE—"DIFFICULT AND EXTRAORDINARY" CASE.

An order granting an extra allowance can only be made where the case is obviously within the definition "difficult and extraordinary," under a rigid construction of the phrase.

McLennan, P. J., dissenting.

Appeal from Special Term, Jefferson County.

Action by Mason M. Swan, receiver of the E. S. Stiles Press Company, against Norman C. Stiles. From a judgment for defendant, and an order granting an additional allowance to defendant, plaintiff appeals. Judgment affirmed. Order reversed.

The E. S. Stiles Press Company, a corporation with a capital stock of $60,000, was duly organized in December, 1897, and its capital stock was paid to the sum of $48,500. It succeeded an antecedent corporation organized in November, 1895, and the only change in the two companies was in the name. Its business was the manufacture of hammers, presses, etc., and it was located in the city of Watertown. At the time of its organization it entered into an agreement with Samuel F. Bagg, an iron manufacturer in said city, whereby it agreed to turn over to him its entire outfit of tools and machinery, which he was to install in his plant, and to use in the manufacture of machinery for said Stiles corporation, and of the character which it had theretofore manufactured. The agreement provided that "the tools and machinery * * * shall be considered as collateral security" for the amount due Bagg for work, and for other considerations set forth therein. Under the agreement, Bagg carried on the manufacturing business for the corporation until January 7, 1899, when it was indebted to him on open account in the sum of $18,000. He had been unsuccessfully pressing the company for payment. He had from time to time accepted assignments of accounts due it. Its affairs were in a precarious state, and the directors realized the necessity of raising money in order to prevent its collapse. In this critical condition of its affairs, the company executed to Knowlton, its president and a director, a chattel mortgage of all its tools, machinery, fixtures, appliances, patterns, and patents, and which included substantially all of its tangible property, and which was to secure the payment of three promissory notes, of $5,000 each, given by said corporation, and indorsed by said Knowlton for its benefit. Accompanying the mortgage, and as further security for such indorsement, was an assignment by the company of certain of its open accounts to the amount of $6,500. Two of the notes were turned over to Bagg towards the payment of his account, and the other negotiated by Knowlton, for the company, with the Watertown National Bank, and the avails placed to the credit of the corporation. The two notes delivered to Bagg were also negotiated at the same bank. This scheme was the result of an arrangement with Bagg in which he agreed to release his lien upon this property upon the transfer to him of said notes, and the lien evidenced by the original agreement referred to, and which had been duly filed, was relinquished by him. The defendant was not an officer in the Stiles corporation, or interested pecuniarily in its business. His son was a director and its promoter, and the largest owner of its capital stock. Simultaneously with the consummation of the plan detailed, and as a part of it, the defendant agreed in writing with Knowlton that, in the event of the foreclosure of said chattel mortgage, he would pay any deficiency which might arise thereon, except for interest; but this liability did not extend to the bills receivable, which were transferred to Knowlton. The scheme outlined was carried out, and the business of the corporation continued as before until November, 1899, when, upon the application of its directors, the corporation was dissolved, and the plaintiff appointed its receiver. Knowlton transferred the chattel mortgage security to the bank, and the indebtedness on the three notes in November had been reduced to $11,225.45, and it foreclosed the mortgage, and the property

was purchased at the mortgage sale by the defendant for $14,750, and he paid the cash therefor. The notes were paid, and the balance, $3,299.19, is now in the custody of the attorney of the bank, ready to be delivered to the receiver at any time. This action is by the receiver to have the chattel mortgage declared void, and to compel the defendant to account for the property received on the mortgage sale. The complaint charges that the corporation was insolvent, and had refused to pay its debts at the time of giving the mortgage to Knowlton, and that it was given "in contemplation of its insolvency, and with the intent to give a preference to the said Samuel F. Bagg and others." The second paragraph of the complaint alleges that the requisite consents of the stockholders owning two-thirds of the capital stock of the company did not precede the giving of the mortgage. The facts pertaining to that allegation will be adverted to later.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Elon R. Brown, for appellant.
Henry Purcell, for respondent.

SPRING, J.    Section 48 of the stock corporation law, which is the basis of the present action, reads as follows:

"No corporation which shall have refused to pay any of its notes or other obligations when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash. No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation shall be valid. Every person receiving by means of any such prohibited act or deed any property of the corporation, shall be bound to account therefor to its creditors or stockholders or other trustee." Laws 1892, p. 1838, c. 688.

It is to be noted that the prohibition against the transfer of its property to its officers or stockholders is founded upon the refusal of the corporation to pay its debts. The other vice within its condemnation is the transfer of any property of the corporation when it is insolvent, or its insolvency is impending, "with the intent of giving a preference." The referee has found as facts that the corporation has not refused to pay any of its due obligations prior to the giving of the chattel mortgage, and also that no preference was intended. The corporation was unquestionably in straitened circumstances. It had extreme difficulty in meeting its obligations. It owed large sums to Bagg, and he was urging payment. While the company did not have ready money enough to meet this indebtedness, and was assigning accounts to stay its enforcement by action, it had not reached the extremity of refusing to pay. The directors, believing there was adequate property to pay the debts of the company, were striving to raise the money to arrange with its creditors, and to enable it to continue its business. The giving of the notes and chattel mortgage to Knowlton was the fruition of their plans. Knowlton received no benefit from the transaction. He was not a creditor of the company. He pledged his own credit to relieve the pressing condition of its affairs, and took his chances on the security which he received. Stiles, the respondent, was also

disinterested. His only motive was to aid the company, in which his son was a heavy stockholder. There was no intention to prefer Bagg. He already had a lien upon the tools and machinery of the company, and, upon the payment of $10,000, was willing to forego that benefit and wait for the residue of his large debt. Beyond this, he could have filed a mechanic's lien at any time upon this property. This scheme was adopted obviously to aid the company, and with the expectation or hope that its business might be carried on successfully. It did continue as a going concern until November following, and during that period there was apparently no refusal to meet its obligations. The statute quoted was designed to secure a fair distribution of the assets of a failing corporation among its creditors, and to prevent a preference of any of them. It does not, however, go to the fanciful extent of prohibiting the directors from paying or securing a debt of the corporation. Paulding v. Chrome Steel Co. et al., 94 N. Y. 334. The directors of a corporation may appreciate that its affairs are in a hazardous condition, because of the lack of ready money to pay its current obligations and to carry along its business. They may believe that the company is able to pay its indebtedness in full if opportunity is given to convert its quick assets into money, and if the business can be continued. They accordingly borrow money, and give security therefor, and pay a threatening creditor in the expectation that a crucial period has been successfully tided over. Their expectations may not be realized. Their hopes may turn out to be illusory. The unfortunate issue does not stamp the transaction as fraudulent. Its character is to be gauged from the aspect presented at the time it was done, and not in the light of the subsequent events, which could not have been reasonably foreseen by the directors. The test is, may we fairly conclude a preference was the motive impelling the action of the directors, or was it an honest, though misguided, effort to save the corporation? Eliminating from our consideration the fact that the company after 10 months ceased business, and we cannot determine, as matter of law, that the giving of the notes and accompanying security was so improvident that it should be held to establish an intent to give a preference to Bagg. Eight thousand dollars of his debt were held in abeyance. Five thousand dollars of the avails of the notes were used to ease up the affairs of the company, and with this ready money, and the only insistent creditor satisfied, the directors may well have anticipated a fortunate outcome, although their entire scheme of business, from its origin, appears to have been intrinsically defective. Nor was there any reason why a preference should have been intended to be given to Bagg. He could easily have enforced his lien upon the property in his possession, and that would have deprived the company of its property essential to its maintenance, and its dissolution would have followed. The only way out of the dilemma was to induce Bagg to release his lien, and to postpone the collection of a part of his debt, and those two ends were achieved by the plan challenged. It is easy now to say that the company was insolvent at the time the chattel mortgage was given. The directors, however, were acting from the conditions then existing, and in the best of faith; and a transaction of that kind is not contrary to public policy or invalid, even though the

corporation was in fact insolvent at the time.   Converse v. Sharpe and One as Receivers, 161 N. Y. 571, 56 N. E. 69.   In the transaction assailed by that action, four of the directors of the corporation loaned to it $60,000, accepting as security various securities of the company. They acted in good faith, but the corporation was hopelessly insolvent at the time, and its liabilities exceeded its assets by more than $2,000,-000.   These directors had acted "in an honest belief and expectation that the company, as a going concern, might be tided over its embarrassments, as it had been represented to be possible by an investigating committee, and without any personal advantage taken."   In that case it is to be observed that the lenders of the money were the directors of the company, and charged with the duty of knowing its real condition, yet the transaction was upheld because they acted in good faith, for what they believed was for the best interests of the company they represented, and with no design of reaping any personal benefit therefrom.   See, also, Sandford Tool Co. v. Howe-Brown Co., 157 U. S. 312, 15 Sup. Ct. 621, 39 L. Ed. 713.   The whole proceeding terminating in the proceeding pursuant to the chattel mortgage indicates the honest purpose of those connected with it.   Bagg relinquished a subsisting lien, and reduced his debt by the amount of the two notes transferred to him.   The bank obtained his notes, as well as the third one, as ordinary commercial paper, before maturity, and unquestionably became a bona fide holder.   It received as collateral security for the notes the chattel mortgage given to Knowlton.   Upon the public sale of the mortgaged property, the defendant, in order to protect himself on his guaranty, became a bidder, and purchased the property, paying a fair price therefor.   The notes were paid, and the balance is ready for the receiver.   The man who voluntarily, and without profit inuring to himself, endeavored to accede to the wishes of the directors and stockholders, by assisting them to raise the money needed to surmount a crucial plight in the affairs of the company, is now attacked for his conduct.   There is no pretense that he was personally the gainer by the deal.   To cap the climax, he is to be despoiled of his property without the return to him of what he paid for it.

It is claimed that the mortgage was given "without the consent of the stockholders owning at least two-thirds of the stock of the corporation."   Section 2, p. 1825, Stock Corporation Law.   Nine hundred and seventy shares of the capital stock were issued, and, upon the face of the written consent given, those owning only 360 shares executed the consent.   Prior to the 30th of December, E. S. Stiles owned 620 shares of the capital stock of the company, and on that day transferred to it 500 shares.   When the consent was prepared, apparently Stiles only owned 120 shares.   On the 7th day of January, 1899, the 500 shares of stock were reissued to him, the consent was acknowledged, and the chattel mortgage given.   It is conceded that all of the stockholders signed the consent, except those owning 90 shares.   If the 500 shares were absorbed by the company at the time of the granting of the consent, stockholders owning two-thirds of the issued stock consented to the giving of the mortgage.   It is the amount of the stock actually issued and owned which is taken into the account in ascertaining whether the necessary two-thirds are represented in the writ-

ten consent to mortgage. Greenpoint Sugar Co. v. Whitin, 69 N. Y. 328–338, 339; Atlantic Trust Co. v. Crystal Water Co., 72 App. Div. 539, 76 N. Y. Supp. 647. We are not to scrutinize the formal execution of this consent too rigidly, inasmuch as Bagg, Knowlton, and Stiles fully performed on their part. Hamilton Trust Co. v. Clemes, 163 N. Y. 423, 57 N. E. 614.

As has already been adverted to, respondent gave full value for the mortgaged property, and the cash was mainly applied in payment of the balance of the note indebtedness, and the residue can be used by the receiver for the benefit of the creditors of the insolvent corporation. Even if the directors acted with the intent to prefer the debt of Bagg, and even if the corporation was then unable to pay its debts, the respondent was not responsible for its condition, and cannot be charged with the wrongdoing, if any there was. Before the receiver can regain the property which the respondent purchased at a fair public sale, he should restore what Stiles paid for the property. Duncombe et al. v. N. Y. & N. H. R. R. Co. et al., 84 N. Y. 190-199; Steinway v. Steinway, 2 App. Div. 301, 37 N. Y. Supp. 742, affirmed in 157 N. Y. 710, 53 N. E. 1132. If any preference was granted, Bagg was the creditor who received that favor. No benefit accrued to the respondent. He acquired the title of the bank—a holder in good faith— and paid full value. It would be inequitable to permit the receiver to repudiate the sale, divest Stiles of the property, and still have the purchase money he paid applied in payment of the debts of the corporation now represented by the plaintiff.

The court at Special Term granted an additional allowance of costs to the amount of $600 on the ground that the action was difficult and extraordinary. The policy of the courts in this department has been averse to granting an extra allowance except in a case obviously within the definition "difficult and extraordinary." A rigid rather than a liberal construction has been given to this phrase. Following that uniform practice, we are constrained to disagree with the court at Special Term, and reverse this order, with $10 costs.

The judgment should be affirmed, with costs. The order granting the additional allowance is reversed, with $10 costs, and the motion is denied, with $10 costs. All concur, except McLENNAN, P. J., who dissents.