Henry Epstein, J.
This action was commenced on May 3, 1961 by service of summons and complaint and an order to show cause seeking injunctive relief: (1) restraining defendants from participating in the annual stockholders meeting of Gray Line Motor Tours, Inc., scheduled for May 5, 1961; (2) from participating, etc. in the scheduled annual meeting of Fifth Avenue Coach Lines, Inc., on May 8,1961; (3) from acting pursuant to proxies received pursuant to proxy statement of March 29, 1961; (4) from voting the 204,403 shares of Fifth Avenue Coach Lines, Inc., stock registered in name of Gray Line Motor Tours, Inc., at the May 8,1961 meeting or any special or annual meeting subsequently; (5) from considering said 204,403 shares in ascertaining if a quorum were represented; (6) from paying, etc. increased retirement benefits to defendants Moreland and *237 Duggan beyond those provided in their 1955 agreements; (7) from carrying out the voting trust between Bankers Trust Company and Fifth Avenue Coach Lines, Inc., or amendments thereto; (8) calling for a reasonable time to allow resolicitation of proxies for a postponed meeting of stockholders; (9) voiding the voting of the 204,403 shares of Fifth Avenue Coach Lines, Inc., held by Gray Line Motor Tours, Inc.; (10) voiding the proxies of Fifth Avenue Coach Lines, Inc., dated March 29,1961; (11) voiding the voting trust agreement between Bankers Trust Company and Fifth Avenue Coach Lines, Inc.; (12) decreeing all that may be just to rectify improper actions taken. In view of the prompt order for trial directed by the Justice at Special Term, general denials were accepted as the answers of defendants when so orally made at the opening of the trial.
By amendment to the complaint, granted at the opening, plaintiff added factual allegations which might have been permitted as proof without such amended pleading, in view of the time stress involved. These concern the proxy material, the substantial losses suffered in the first quarter of 1961 and withheld from the stockholders, the improper conduct of the meeting on May 8,1961 without regard to the rights of stockholders, and a petition for a special meeting of the stockholders of Fifth Avenue Coach Lines, Inc., for all proper corporate purposes, including election of directors, appointing competent disinterested persons as inspectors of election thereat. To this amended complaint defendants are also deemed to have interposed a general denial.
At the Special Term motion hearing, the subject matter dealt with was clearly delineated by the Justice there presiding. His memorandum opinion, while denying a temporary injunction 1 ‘ on the very eve of the holding of the stockholders meeting ’ ’, did restrain “ the disputed Gray Line stock ” from being voted; restrained any approval of the pension plan changes affecting defendants Moreland and Duggan; held a. prima facie case made out by plaintiff, and by its order thereupon entered on May 5, 1961, set the case down for prompt trial on filing of an approved undertaking for $25,000 by plaintiff. The said undertaking has been executed, filed and this case has been expeditiously tried in accordance with the provisions of the Special Term order of May 5, 1961. Counsel have stipulated that findings of fact and conclusions of law be waived and the litigants have agreed to decision by this court without such findings and conclusions. In view of the time element involved and the necessity for prompt disposition, only those factors which this court deems essential to its conclusion will be set forth.
*238 Basically, these United States of America are wedded to political and economic democracy. National and State laws have for at least a century been designed to protect business and government from incursions which might undermine that way of life. Understandably, but not necessarily commendably, corporate and individual businesses have sought to by-pass these lawful restrictions on a truly free-enterprise economy. In the most recent decision of the United States Supreme Court both majority and minority opinions have underwritten this basic thesis of our national life (United States v. du Pont & Co. 366 U. S. 316, revg. in part 177 F. Supp. 1). In the instant trial this court is convinced that the established principles of law and equity require nullifying the proceedings of the stockholders meeting of Fifth Avenue Coach Lines, Inc. (hereafter called “ Fifth Avenue ”) and the calling of a special meeting with supervision by officers of the court. At such meeting action will necessarily be considered on matters which were the subjects of a controversy before the Special Term and on this trial. To the end that such action will not be hamstrung by inequitable controls, additional safeguards will be hereinafter provided.
In the course of reconstituting its corporate and corporal structure in the years 1954 to 1957, defendant Fifth Avenue became the parent of Gray Line and owns 68% of the voting stock of its said subsidiary. The balance of 32% is owned by one Jerry Finkelstein and Mrs. Finkelstein. By a voting trust agreement of December 5, 1957 the Gray Line shareholder “ shall be considered to be the holder of that number of Fifth Avenue shares held by Gray Line, which is the same percentage of all Fifth Avenue shares held by Gray Line as the number of Gray Line shares held by him is of all the outstanding Gray Line shares ”. (Par. 5, (6) (i) of said agreement.)
This was intended to and is conceded to have given the said Finkelsteins the right to vote a proportionate share of Fifth Avenue stock for directors of Gray Line. In 1960, and without any consideration therefor, Fifth Avenue without the Finkelsteins ’ consent, cut off these minority stockholders ’ rights vested in them by the 1957 trust agreement. The “ pass-through ” right to share in the voting of the 204,403 Fifth Avenue shares held by Gray Lines was thus terminated. To such extent the voting rights theretofore held by said minority stockholders (the only other stock outstanding and not held by Fifth Avenue) was sterilized, while the total of said shares was voted by the parent. The least that should have been done was to preserve the prorata voting power of the minority shareholders of Gray Line in *239 the 204,403 shares of Fifth Avenue thus held by Gray Line. That right should be restored and the 1960 amendment to the voting trust agreement of 1957 is hereby declared void.
We now proceed to a consideration of the May 8, 1961 stockholders’ meeting at the Biltmore Hotel in this city. We deal here with a publicly held corporation with some 3,500 or more stockholders, many of them small business men and householders. Plaintiff is the largest single stockholder of record with some 52,500 shares purchased over a period going back to 1953. This represents many times the total shares held by the entire Board of Directors of Fifth Avenue. Director Grayson M. P. Murphy of Fifth Avenue is a senior partner of the law firm which received in the past three years some $640,000 in counsel fees from Fifth Avenue. He handled most of Fifth Avenue’s corporate law work for his firm and actually dictated the proceedings at the questionable May 8, 1961 meeting of stockholders. At this meeting public shareholders sought to voice their views on matters which had not been made known to all of them. The testimony and the minutes of said meeting reveal that the meeting was chaotic, unmanageable and “ disgraceful ”. Both sides seem to agree on this at least. There would seem to be little question that many of the individual stockholders were still seeking admission when the meeting was under way. There is no question that Fifth Avenue’s doorkeepers, who checked stockholders and proxies for admission, allowed many persons into the meeting who were neither stockholders nor holders of proxies. There is some question whether the microphone went “ dead ” at a critical time. But there is no doubt that one Max Beller, a retired poultry dealer, to whom the term “ hireling ” or paid “ stooge ” for Fifth Avenue’s management, may well be applied, a stockholder and director of Gray Lines, did forcibly take the microphone from a stockholder, read a list of names as nominees for directors, and a vote called and tabulated amid a confusion which shocked even the presiding officer, Moreland, and Mr. Murphy the chairman’s mentor and Fifth Avenue’s counsel.
The minutes state that the “ reading is unintelligible because of confusion ” (minutes of stockholders’ meeting, pp. 4^5). The replies to questions of stockholders by Chairman Moreland are repeatedly recorded as ‘1 inaudible ’ ’.
At a later stormy period in the meeting Beller again seized the microphone from a stockholder and disputed the latter’s revocation of his proxy (minutes, stockholders’ meeting, p. 35). Once more Beller moved the questionable pension plan and foreclosed *240 any discussion (minutes, stockholders’ meeting, p. 115). Employing such a person for these purposes, including “ sleuthing ” for management, must meet with condemnation.
Beller was paid $2,000 for reporting to President Moreland the gossip he would gather at brokerage offices and for aiding in soliciting management support.
At this meeting of May 8,1961, while the typewritten order of business called for the customary statement of earnings for the first quarter of 1961, this was not followed. Some of the stockholders had knowledge of the losses suffered. The 1960 annual statement had shown some improved earnings, but the losses of an unprecedented $892,000 for the first quarter of 1961 was not made known, when the directors were thus chosen for 1961 midst confusion. These losses were contained in monthly statements filed with the Public Service Commission of New York State and the Comptroller of New York City. They would thus be available for those who might seek out the information thus filed. (January and February, 1961, were on file.) But the testimony of Solomon S. Silbert, owner of some 6,600 shares of Fifth Avenue, an attorney and certified public accountant, evidences improper conduct by Vice-President Stephen C. Duggan. Silbert testified that he received copies of the monthly and quarterly reports from Mr. Duggan before they were filed officially. He produced such copies in their original form and testified he had been given such advance information for more than a year “ previous ”. This information, which was intended for his “ personal ” use, he passed on to friends who had invested in Fifth Avenue on his advice. Despite Duggan’s testimony to the contrary, originally given, he was not called to rebut this concluding witness for plaintiff. A fair appraisal of the testimony warrants belief in Silbert’s testimony.
Several of the stockholders who were witnesses for plaintiff had no contact with plaintiff’s counsel prior to the meeting. They made their views known to plaintiff’s counsel at the meeting and immediately thereafter. There is no warrant in the record or on the trial, for the conclusion by defendants that this chaotic meeting was the calculated work of plaintiff. The evidence wholly disputes this. If, anything, the evidence would indicate a panic-ridden board of directors seeking to forestall full discussion and to refrain from giving stockholders information sought by them. The responsibility for the chaos is laid at the door of those who sought to conduct the meeting and in the course thereof to foist on the stockholders present views which might have met with stern opposition had facts been revealed when sought. Study of the facts and the records in *241 the cases cited by defendants do not make them authority for general application, particularly in the situation herein revealed. (Matter of Hoe & Co., 14 Misc 2d 500, affd. 285 App. Div. 927, affd. 309 N. Y. 719; Matter of Doeskin Prods., 7 A D 2d 42.) There is no basis in this record or on this trial for the conclusion stated on page 21 of defendants’ brief that “ Management made every effort in spite of disruptive tactics by those associated with plaintiff to conduct a meeting that would be fair to all those present ”.
In fact, the choice of Seller as Management’s spokesman is itself an indictment of the management. He was a crude, hired troublemaker who was well paid for his part in the disgraceful conduct of the stockholders ’ meeting. A word is here appropriate in answer to the motion made by counsel for defendant Gray Line and joined in by other defendants’ counsel. That motion sought to have this court dismiss the complaint on the ground that plaintiff stockholder was not present, nor voted its stock at the meeting, either by itself or through a proxy. It is enough to call attention to the fact that in their post-trial brief defendants do not again present this argument. It would indeed be a harsh judgment that would bar a holder of stock from pursuing his rights when the shareholder could prove, as here was amply proved, that the stockholders’ meeting was a farce and a denial of the rights of those who hold shares in a publicly-owned corporation. These shares are dealt in daily on the New York Stock Exchange. This court cannot countenance either the argument advanced or the view that this action under the circumstances here revealed constitutes an unwarranted interference “ in the internal affairs of Fifth Avenue ”.
Since this court has reached the conclusion that fair dealing and public stockholders’ interests require a new meeting to be held for election of directors and other matters which may properly be considered thereat, it becomes necessary to consider the other contested issues reserved for this court. The more important of such questions is that involved in the power of Fifth Avenue to vote or control the vote of its subsidiary Gray Line of the 204,403 shares of Fifth Avenue stock. New Jersey and Delaware by statute forbid such voting by the parent or subsidiary. (Thomas v. International Silver Co., 72 N. J. Eq., 224; Italo Petroleum Corp. v. Producers Oil Corp., 20 Del. Ch. 283; Continental-Midwest Corp. v. Hotel Sherman, 13 Ill. App. 2d 188.) This year (1961) the New York State Legislature enacted section 612 of the Business Corporation Law which does not become effective until April 1,1963:
*242 “ § 612. Qualification of voters.
“ (a) Every shareholder of record shall he entitled at every meeting of shareholders to one vote for every share standing in his name on the record of shareholders, unless otherwise provided in the certificate of incorporation.
“(b) Neither treasury shares nor shares held by another domestic or foreign corporation of any type or kind, if a majority of the shares entitled to vote in the election of directors of such other corporation is held by the corporation, shall be voted at any meeting or counted in determining the total number of outstanding shares ”.
Defendants argue that this statutory effective date “ demonstrates conclusively that at the present time the law of the State of New York permits a subsidiary corporation to vote the stock of a parent corporation which it owns. The only exception, in New York law, must be based upon proof that the subsidiary was organized or the transfer made solely in order to achieve a fraudulent result. (Lazenby and Wormser, supra).” This court cannot accept such reasoning. The fact that the Legislature has enacted the above provision into law, effective April 1, 1963 does not, for all purposes, in all cases, irrespective of the facts revealed, hold open the door for flagrant violation of stockholders’ rights. Further, in regard to the new section 612 of the Business Corporation Law, “effective April 1, 1963”, the memorandum of Governor Nelson Rockefeller’s approval is significant: “ In large measure the bill is a restatement and a clarification of existing law, but important changes have also been made ”. Nor is the case of Lazenby v. International Cotton Mills Corp. (174 App. Div. 906, affd. 226 N. Y. 645) authority for the proposition so ardently urged by defendants.
Lazenby involved opposition to the dissolution of a corporation. There, the Referee held the subsidiaries’ holdings were not material to his decision. He also held that the ‘ ‘ subsidiary corporations although controlled by the New York Company were operated as separate companies with separate staffs of officers and varying boards of directors and not as branches of the New York Company.” (Record on Appeal, p. 83.) Even in defendants’ brief in the instant case, the Referee’s report is quoted as follows: ‘ ‘ Undoubtedly this theory of distinct existence may be pushed too far and it is sometimes disregarded in cases of fraud or where the public interests are involved.” (Italics supplied, see p. 52 of brief of defendants.)
In the Lazenby case the facts reveal more than enough votes for dissolution without the subsidiaries’ parent stockholdings. The honorable Referee further held as a conclusion of law *243 (Record on Appeal, pp. 92-93): “4. If the stock of the New York Company, which stood of record in the names of the Turner Company, the Consolidated Company, and other subsidiary corporations, was in law disqualified from voting for and consenting to the dissolution of the New York Company, then said stock was not outstanding within the meaning of Section 221 of the General Corporation Law and more than two-thirds of the outstanding stock which was qualified voted for and consented to the dissolution ”.
This hardly warrants the conclusion of defendants’ counsel that such shares held by a subsidiary could and should be counted for any purpose. Nor can the failure of the S. E. C. or other regulatory body to intervene in this action, knowing it to be pending, be deemed an argument against plaintiff’s claims on the facts revealed on this trial. Such supervisory and regulatory bodies may well await the results of such an action as this before undertaking further, any action. The generally applicable principle of law is well stated in Ballantine, Corporations (Rev. ed. [1948], § 176, p. 402): “ The corporation cannot vote shares of its own issue acquired by it, nor can a wholly owned or dominated subsidiary or affiliate vote shares in its parent or controlling corporation, as the management of the parent could control the vote on its own behalf” (emphasis supplied). (28 U. Chi. L. Rev. 151.)
New York cases lead to the same conclusion and are now made statute law from April 1,1963 (Vail v. Hamilton, 85 N .Y. 453; Swan v. Stiles, 94 App. Div. 117, 124; Matter of Barker, 6 Wend. 509, 510). The perpetuation of the 204,403 Fifth Avenue shares in subsidiary Gray Line as still “ outstanding ” and therefore “voting” stock does inhibit possible independent stockholders’ action. Practical consequences must command the attention of a court of equity. Corporate democracy must be maintained in the economy of our political democracy. The voting trust controlling the 204,403 shares of Fifth Avenue stock is declared invalid. In the meeting of the shareholders of Fifth Avenue hereinafter directed, the only portion of said shares which might be voted by Gray Line is the derivative interest of the Finkelsteins ’ 32% as an appropriate “ pass-through ” relief under the reasoning of La Buy, J., in United States v. du Pont de Nemours & Co., 117 F. Supp. 1, revd. on other grounds 366 U. S. 316, supra). This result does no violence to the principles of law applicable to stockholders and satisfied the conscience of a court of equity.
The one remaining matter for consideration is that dealing with the increased pension rights of defendants Moreland and *244 Duggan. In a meeting on May 9,1955, stockholders approved a pension and employment agreement which provided in part: “ Bach such agreement would provide that (a) the person receiving it will be obligated to continue working full-time for the corporation at his present salary, or any increased salary the Board of Directors may grant, until he reaches the age of 70.” (Exh. 17A, p. 3; Exh. 20A, 20B.)
The employees so affected (Moreland and Duggan): “8. As a condition of and in consideration for the pension payments prescribed by paragraph 5 of this Agreement, (employee) hereby waives any and all rights that he might have or otherwise assert to the payment of any other pension, retirement allowances or similar emolument by the company ’ ’.
These employees had no employment agreements, no pension plan and no stock options at the time. Thereafter these employees, as officers, were assured of substantial incomes and benefits to themselves and their widows on death. They were well advanced in years and fast approaching 70 years. With but four years to go (1965) increases were granted to Moreland so that his pension would rise from $13,500 under the 1955 agreement to $35,100, an increase of $21,600. For Duggan his pension would rise from $16,000 under the 1955 agreement to $27,500, an increase of $11,500 (minutes of stockholders’ meeting, pp. 70-71). These two, Moreland and Duggan, received ample consideration for their increased duties and were it within contemplation that added increases or bonuses were to await so short a time service in higher positions, it might at least have been so clearly stated. At least the stockholders were entitled to have a clear statement of the 1955 and contemplated 1960 changes. The action on this proposed increase of substantial value to these two men must be given full consideration before being authorized. (See Godley v. Crandall & Godley Co., 212 N. Y. 121, 133; Davids v. Davids, 135 App. Div. 206; Everett v. Phillips, 288 N. Y. 227, 232; Sage v. Culver, 147 N. Y. 241, 247; Fogelson v. American Woolen Co., 170 F. 2d 660, 663.)
Since it is determined that a special meeting shall be called to elect directors and officers, to pass upon the pension plan for the officers Moreland and Duggan, and for such other business as may be properly considered, the proxy statement shall specify these matters, including the foregoing. Since any stockholder is “ affected in some way by an unfair or irregular election ” (Matter of Hoe & Co., supra), this court hereby designates the following two wholly disinterested persons to supervise and direct the special meeting of stockholders to be held within 60 days from the date of the order to be entered herein: Prof. Paul R. *245 Hays of Columbia University Law School, 276 Riverside Drive, New York City; Mortimer Schwager, Esq., of 425 Park Ave., So., New York City. Settle order and judgment accordingly. (Exhibits may be called for at Clerk’s office, Part XIV.)